Benjamin C. MALLORY Plaintiff–Appellant,

v.

OHIO UNIVERSITY, Ryan Davis, Bradley Pitcher, and Harris Pratsinakis Defendants–Appellees.

No. 01–4111.

United States Court of Appeals, Sixth Circuit.

Sept. 11, 2003.

Jan L. Roller, Dennis R. Fogarty, Davis & Young, Cleveland, OH, for Plaintiff–Appellant.

Keith W. Schneider, Maguire & Schneider, Columbus, OH, Herman A. Carson, Sowash, Carson & Shostak, Athens, OH, William B. Benson, Michael L. Close, Wiles, Boyle, Burkholder & Brindardner, Columbus, OH, Christopher R. Meyer, Rodney A. Nelson, for Defendants–Appellees.

Before NORRIS, DAUGHTREY, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.

Benjamin C. Mallory filed a complaint against Ohio University (the "University") for sexual discrimination under Title IX. 20 U.S.C. §§ 1681–1688, alleging that the University discriminated against him by initiating a disciplinary proceeding against him and by concluding that he committed sexual assault under the University's code of student conduct. Mallory also filed state-law defamation claims against three students—Ryan Davis, Bradley Pitcher, and Harris Pratsinakis—each of whom made statements in connection with Mallory's disciplinary proceeding. The district court granted the University summary judgment against Mallory, finding that Mallory failed to present a genuine issue of material fact with regard to whether the University's actions were motivated by Mallory's sex. The district court also declined to exercise jurisdiction over Mallory's supplemental state-law claims, having disposed of Mallory's only federal claim. Mallory appeals, arguing that the district court erred in granting the University summary judgment and asking the court to order the assertion of supplemental jurisdiction over Mallory's state-law defamation claims upon remand. We conclude that the district court (1) correctly determined that Mallory failed to present a genuine issue of material fact regarding discriminatory motive, and (2) did not abuse its discretion in declining to exercise jurisdiction over Mallory's state-law claims. Accordingly, we affirm the judgment of the district court.

On November 19, 1997. Benjamin Mallory was to meet Audrey DeLong and some of her friends at a bar in downtown Athens, Ohio. Prior to meeting DeLong that night, Mallory drank three beers in his dorm room. When Mallory met DeLong at the bar, it was clear to him that DeLong had been drinking throughout the evening. Both Delong and Mallory continued to drink at bars in Athens that night, each consuming a number of drinks. At the end of the evening, Mallory and DeLong were together in Mallory's dorm room.

The two had been necking for a time in Mallory's room when DeLong became sick and vomited on Mallory and his bed. Mallory then took DeLong to the bathroom and put her into a toilet stall as she continued vomiting. While DeLong was in the stall, several students who lived on the hall observed DeLong in what they described as an obviously intoxicated state, and some witnesses recalled that DeLong had passed out while she was in the stall. Later, Mallory and a fellow student took DeLong into a shower stall to clean off the vomit. After DeLong was in the shower, the other student left, and Mallory began washing vomit off himself in an adjacent shower stall. According to Mallory, DeLong then entered his stall and began

making sexual advances. Mallory claims that he first resisted DeLong's advances, but then consented. The two then began having sex in the shower stall. A number of students witnessed Mallory and DeLong in the shower: some of the students indicated that DeLong was not moving during the incident. One student claimed that DeLong was not only still, but she was silent and her eyes were closed. Two Resident Assistants ("RAs") eventually intervened and DeLong was taken back to her sorority house. Then, after speaking with several witnesses, the two RAs prepared a Community Incident Report, which noted that "Ben Mallory recalled the incident and most likely Audrey DeLong did not."

After the University Police completed an investigation, the University instituted a disciplinary proceeding against Mallory, charging him under Section A–6(e) of the Student Code of Conduct. Section A–6(e) prohibits "sexual assault." The University defines "sexual assault" as "any attempted or actual unwanted sexual behavior." Richard Carpinelli, Director of Judiciaries for the University, prepared the case for disposition at a judiciary hearing and eventually served as the "advisor" to the disciplinary hearing board. Around the same time, Mallory faced felony sexual battery charges in Athens County.

Mallory's disciplinary hearing began on April 2, 1998 and continued into the next day. Mallory's defense attorney was allowed to attend the disciplinary hearing, but was not allowed to participate. Instead, Mallory was "represented" by a fellow student. During the hearing, Mallory's student representative was limited to asking questions about the matters each witness discussed on direct. Mallory did not testify at the hearing because of the felony charge pending against him. The board did consider, however, a written statement that Mallory had given to the University Police the morning after the incident. The board also considered the accounts of eight witnesses, each of whom stated that DeLong did not appear capable of consenting to sexual intercourse. Many of these witnesses confirmed that Mallory was himself intoxicated, but that DeLong was by far more intoxicated. DeLong also made a statement at the hearing, relating that the last thing she remembered of that evening was being at one of the bars in Athens.

The disciplinary board found that Mallory violated Section A–6(e) and recommended his expulsion from the University. The board's "Rationale for Guilt" stated that DeLong's degree of intoxication was such "that the victim's judgment was so impaired that she would not have been capable of making rational decisions about her welfare: as such she could not have given consent to engage in sexual intercourse with the accused student." Mallory petitioned the University's president for review, but the president upheld the board's decision and Mallory was expelled.

Mallory then brought an action against the University, alleging a violation of Title IX, 20 U.S.C. §§ 1681–1688. Mallory also brought state-law defamation actions against Ryan Davis, Bradley Pitcher, and Harris Pratsinakis (the "Students") for statements that each made in connection with the incident.[1] The University moved for summary judgment. The district court granted the University's motion, finding that Mallory had not demonstrated a genuine issue of material fact with regard to whether the University's actions were mo-

---

1. Mallory also brought a number of other claims against other individuals in connection with this incident. The district court, for various reasons, dismissed the other claims. Mallory does not appeal the dismissal of the claims against the other parties.

tivated by Mallory's sex. The district court then declined to exercise jurisdiction over the state-law defamation claims against the Students, and dismissed those claims without prejudice. Mallory now appeals.

## I. The District Court Properly Granted the University's Motion for Summary Judgment.

■ Mallory's claim for damages against the University is based on Title IX. which reads in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a). Neither party disputes that the University is a post-secondary educational institution that receives federal funds. Moreover, it is also clear that by expelling Mallory from the University as a result of the disciplinary process, the University has excluded Mallory from "participation in" its educational program. Here the key inquiry is whether Mallory has presented a genuine issue of material fact with regard to whether the University, in its initiation and prosecution of the disciplinary action, excluded Mallory because of his sex.

### A. Standard of Review

We review a grant of summary judgment de novo, using the same standard as the district court. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir.2000) (citing *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir.1995)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law," FED.R.CIV.P. 56(c). To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact. *See id.* (citing *Klepper v. First Am. Bank*, 916 F.2d 337, 341–42 (6th Cir.1990)).

### B. Discussion

Neither the Supreme Court nor the Sixth Circuit has set forth a standard for determining when intentional discrimination has occurred in a case where a student has relied on Title IX to challenge either the initiation or the outcome of a disciplinary proceeding. Both parties and the district court viewed this case through the analytical framework provided in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir.1994). In *Yusuf*, the Second Circuit, analogizing from Title VII law, categorized Title IX claims against universities arising from disciplinary hearings into "erroneous outcome" claims and "selective enforcement" claims, both of which require a plaintiff to demonstrate that the conduct of the university in question was motivated by a sexual bias. *See id.* at 714–15.

On appeal, Mallory also asks this court to read two other Title IX intent standards—the "deliberate indifference" standard and the "archaic assumptions" standard—into the *Yusuf* framework. The "deliberate indifference" standard is applied where a plaintiff seeks to hold an institution liable for sexual harassment and requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). The "archaic assumptions" standard, which has been applied where plaintiffs seek equal athletic opportunities, finds discriminatory intent in actions resulting

from classifications based upon archaic assumptions. *See Pederson v. La. State Univ.*, 213 F.3d 858, 880–82 (5th Cir.2000); *see also Horner*, 206 F.3d at 693 n. 4 (discussing the pre-rehearing opinion in *Pederson*).

Even assuming *arguendo* that these standards apply, we conclude that Mallory failed to present a genuine issue of material fact regarding whether the University's actions were motivated by Mallory's sex.

### 1. Erroneous Outcome

First, Mallory has not shown a genuine issue of material fact with regard to his claim that the outcome of University's disciplinary proceeding was erroneous because of sex bias. Mallory was charged under the University's Student Code for sexual assault, which is defined as any attempted or actual unwanted sexual behavior. Mallory argues that the only evidence at the disciplinary hearing regarding whether DeLong "wanted" to have sex was Mallory's written statement that indicated that DeLong initiated the sexual encounter. Therefore, the argument goes, DeLong was not sexually assaulted inasmuch as she initiated or "wanted" the sexual activity. Mallory argues that the hearing panel's focus upon whether DeLong was able to consent supports finding an erroneous outcome here because the University's definition of sexual assault does not extend to situations where the offender merely knows that the other person's ability to consent is impaired. Mallory argues that the University's focus on DeLong's, but not Mallory's, ability to consent in this instance reveals that the University holds an antiquated notion that "men are sexual aggressors and women are victims."

Mallory, however, has not offered any evidence that the University has ever limited itself in other cases to determining whether the alleged victim "wanted." rath-

er than was incapable of consenting to, sexual activity—much less presented any evidence that the University has applied the former standard to a female who allegedly sexually assaulted someone. Absent such evidence, the University's decision to focus on the ability to consent merely demonstrates the University's policy decision to punish those who engage in sexual conduct with another person when the first person is aware of the other's inability to consent. This is a generally accepted view in Ohio that does not depend on a person's sex. *Cf.* Ohio Rev.Code § 2907.03 (detailing the crime of sexual battery to include sexual conduct with another when "the offender knows that the person's ability to appraise the nature of or control the other person's own conduct is substantially impaired"). Thus, although the University may (or may not) have erroneously interpreted "unwanted" in its Student Code to include "incapable of consenting," there is no evidence that this interpretation was discriminatorily applied or motivated by a chauvinistic view of the sexes.

■ Mallory also argues that prejudicial procedures used at his disciplinary proceeding resulted in an erroneous outcome. Mallory claims (1) that he was denied the use of legal counsel at the hearing, (2) that his student advocate was prohibited from cross-examining witnesses who testified against him, and (3) that the scheduling of the hearing during the pendency of criminal proceedings against him prevented him from testifying on his own behalf. Mallory maintains that these deficiencies led to an erroneous outcome and were a result of discrimination against him based on his sex.

Mallory relies upon an affidavit from a former student, Aaron Zirkle, to demonstrate that the procedures used at the hearing were motivated by sexual bias. In April 1992. Zirkle was asleep in his room

when a female student he had formerly dated entered and crawled into bed with Zirkle. Zirkle, afraid that his roommate would return, argued with the female and eventually agreed to return to the female's room if she promised only to sleep. When the two reached the female's room, the female started making sexual advances and Zirkle left. Zirkle later filed a report against the female under Section A(6) of the Student Code. Richard Carpinelli brokered a compromise between Zirkle and the female, and the compromise led Zirkle to withdraw his complaint. In a letter to Carpinelli, Zirkle complained about how Carpinelli treated him during the process: "I must assume you do not follow University policy and you think ... men cannot be violated.... More likely is as I mentioned earlier this hit some part of you and you do not feel that men can be abused and violated." J.A. at 567.

Mallory claims that the Zirkle affidavit demonstrates that Carpinelli, who, as the Director of Judiciaries for the University, was responsible for the allegedly flawed hearing procedures, held the biased view that "men cannot be violated." As the district court noted, the Zirkle complaint was filed six years prior to Mallory's disciplinary hearing and there are significant factual distinctions between the two. As the district court also rightly indicated, one case by an individual who was subjectively dissatisfied with a result does not constitute a "pattern of decision-making," referred to in *Yusuf* as a basis for finding bias. *See Yusuf*, 35 F.3d at 715; *cf. Lujan v. Franklin County Bd. of Educ.*, 766 F.2d 917 (6th Cir.1985) (noting that in pattern claims of discrimination under Title VII the plaintiff must demonstrate that discrimination was "standard operating procedure") (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396(1977)). Other than the Zirkle incident, Mallory presents no evidence of any other male or female student accused of, or disciplined for, sexual assault. Mallory also presented no evidence of any voting member who has indicated that their decision was motivated by Mallory's sex. Nor has Mallory shown how Carpinelli influenced or attempted to influence the decision of the tribunal, as he was not even a voting member. There is no indication that Carpinelli interrupted the proceedings or wrongfully attempted to steer the result. Without any evidence that Carpinelli influenced the voting members to find against Mallory because of his sex, and without any indication that Carpinelli affected the proceedings in a significant way, Mallory has not demonstrated that a genuine issue of material fact exists with respect to his assertion of a sex-based erroneous outcome.

### 2. Selective Enforcement

■ Mallory has also failed to show a genuine issue of material fact with regard to his selective enforcement theory. Mallory alleges that he was the victim of selective enforcement of the University's prohibition against sexual assault. The focal point of this argument is that the incident report equally implicated both him and DeLong because they were both intoxicated while having sex. These circumstances, Mallory argues, presented a fair question about "who assaulted whom." Mallory asserts that the University's initial determination was driven by the "archaic assumption" that the woman, DeLong. was the victim and the man. Mallory, was the aggressor. This conclusion, Mallory argues, is supported by the Zirkle affidavit, which demonstrates the University's attitude that "men cannot be violated."

Mallory's selective enforcement argument, however, ignores that the initial incident report suggested that Mallory, although intoxicated, was sufficiently aware

to recall the incident and that DeLong was probably unable to remember the event. In addition, upon being questioned by University Police early the morning after the incident, DeLong was unable to remember that she had had sex with Mallory the night before. This evidence, which was not based on the different sexes of the individuals, suggested that DeLong was not capable of consenting to sexual activity, and does nothing to establish that the University's initiation of an investigation against Mallory was motivated by his sex.

Moreover, the only other evidence that Mallory presents to support his selective enforcement claim, the Zirkle affidavit, does not involve sufficiently similar facts to support a selective enforcement claim under *Yusuf.* To support a claim of selective enforcement, Mallory must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University. *See Curto v. Smith,* 248 F.Supp.2d 132, 146–47 (N.D.N.Y.2003) (dismissing a Title IX claim under *Yusuf* analysis for failure to state a selective enforcement claim where academically-expelled female sought to compare more favorable treatment of male who had been dismissed due to misconduct); *cf. Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994) (noting that for the purposes of a Title VII disparate treatment claim a plaintiff must prove that all relevant aspects of his situation are "nearly identical" to those of the female who he alleges was treated more favorably). The circumstances surrounding the Zirkle affidavit were significantly different from those here. The question there was whether Zirkle actually consented to sexual contact with another person with whom he had a history of consensual encounters. In contrast, here the question was whether DeLong was *capable* of consenting. Many witnesses stated that De-Long did not appear capable of consent.

DeLong herself testified that she did not remember the encounter, suggesting that she was not able to consent. Given these differences, the Zirkle affidavit is not sufficiently similar to support a selective enforcement claim.

Consequently, we find that the district court properly determined that Mallory failed to present a genuine issue of material fact regarding his selective enforcement claims under Title IX under either an erroneous result or a selective enforcement theory. The district court therefore properly granted summary judgment against Mallory on his Title IX claim against the University for initiating and prosecuting a disciplinary action against him.

II. The District Court Did Not Abuse Its Discretion By Dismissing the State–Law Defamation Claims.

█ Turning to the district court's dismissal of Mallory's remaining state-law claims, we conclude the district court appropriately dismissed without prejudice Mallory's state-law defamation claims. A district court's ruling declining supplemental jurisdiction will not be disturbed absent an abuse of discretion. *See Weeks v. Portage County Executive Offices,* 235 F.3d 275, 279–80 (6th Cir.2000). The usual course is for the district court to dismiss state-law claims without prejudice if all federal claims are disposed of on summary judgment. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("If the federal claims are dismissed before trial ... the state claims should be dismissed as well."). Because the district court properly granted summary judgment with regard to Mallory's only federal law claim, the district court did not abuse its discretion by declining to exercise jurisdiction over the remaining state law claims in this case.

*CONCLUSION*

For the foregoing reasons we affirm the judgment of the district court.