**NOT RECOMMENDED FOR PUBLICATION**
File Name: 16a0656n.06

**No. 16-3334**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 06, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN DOE I and JOHN DOE II, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| DANIEL CUMMINS, DENINE ROCCO, DEBRA | ) | DISTRICT OF OHIO |
| MERCHANT, and UNIVERSITY OF CINCINNATI, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: DAUGHTREY, GIBBONS, and COOK, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** John Doe I and John Doe II were both students at the University of Cincinnati ("UC"). In unrelated incidents in March 2014, each was charged with violating UC's Code of Conduct for allegedly sexually assaulting female students. Following an investigation and hearing conducted by UC, both Doe I and Doe II were found "responsible" for the respective allegations against them. Doe I was suspended from UC for three years. Doe II received disciplinary probation and was required to write a research paper. Doe I and Doe II filed suit against UC and various school administrators ("the individual defendants") under 42 U.S.C. § 1983, alleging that UC's disciplinary process did not afford them due process as required by the Fourteenth Amendment. Doe I and Doe II also claimed that they were subject to gender discrimination in violation of Title IX of the Education Amendments of

1972.  The district court granted defendants' motion to dismiss on all counts.  For the reasons set forth below, we affirm the judgment of the district court.

I.

A.

The University of Cincinnati is a public university located in Cincinnati, Ohio.  On April 11, 2011, the U.S. Department of Education's Office for Civil Rights circulated a "Dear Colleague" letter to colleges and universities around the country in an effort to provide guidance on complying with Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–88, in the context of sexual-assault investigations.  Specifically, the letter encouraged schools to adopt a preponderance standard of proof, allow appeals for both parties, and "minimize the burden on the complainant" when investigating sexual-assault allegations.  DE 1, Compl., Page ID 5.

In response to the "Dear Colleague" letter, UC adopted certain policies and procedures for investigating and adjudicating alleged Title IX violations.[1]  Within seven days of receiving a complaint, a Title IX Coordinator meets with the respondent and provides notice of the allegations, a copy of UC's Title IX policies, and information about investigation and disciplinary procedures.  At this meeting, the respondent is provided an opportunity to give his or her account of the facts and discuss the nature of the allegations.  Within fourteen days of the complaint being filed, the Coordinator begins interviewing witnesses and gathering relevant evidence.  The respondent is also permitted to provide any relevant evidence or witnesses.  Following this investigation, the Coordinator prepares an investigatory report summarizing his findings.  The report is then provided to both the complainant and respondent for review and

---

[1] For the purpose of our review, we assume appellants' description of UC's Title IX process is true.  *See Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007).

comment. The Coordinator incorporates comments from the parties and, if necessary, conducts a follow-up investigation. During the investigation, the complainant may be provided certain accommodations, including changes in homework, deadlines, grades, classes, and schedules. The respondent, however, may be subject to punitive "interim measures," including restrictions on access to certain campus buildings. *Id.* at 10.

After this initial investigation, the respondent is entitled to an Administrative Review Committee ("ARC") hearing prior to the imposition of any discipline. The ARC is a panel made up of UC administrators. Appellants allege that the ARC panel receives training on UC's Code of Conduct and protecting sexual-misconduct victims but receives no comparable training on protecting the due-process rights of accused students.

At an ARC hearing, panel members function as a board of inquiry and apply a preponderance-of-the-evidence standard in order to resolve the dispute. The respondent is permitted to have an attorney present at the hearing, but the attorney may not actively participate. Cross-examination is allowed, but only by submitting written questions to the panel members, who then determine whether questions are relevant and whether they will be posed to the witness. Neither party may compel witnesses to attend the ARC hearing, but hearsay evidence is allowed. Although parties are not permitted to record the ARC hearings, each party may access the panel's recording of the hearing. Both parties have the right to appeal an adverse decision by the panel.

Between 2010 and the hearings for Doe I and Doe II, the ARC panel presided over nine cases involving sexual-misconduct allegations. The respondent was found "responsible" in each of the eight cases where the panel's decision was disclosed. The punishment imposed in these cases ranged from disciplinary probation to expulsion.

B.

On March 9, 2014, Doe I—at that time a junior at UC's Blue Ash campus—left a party near campus with Jane Roe I and Jane Roe II to accompany them back to their dorm room. Doe I claimed that both Roe I and Roe II were intoxicated. Roe I claimed that she went to sleep after returning to her dorm room but later awoke to Doe I attempting to have sexual intercourse with her. She alleged that she told Doe I "no" and left the room. *Id.* at 28. Doe I then allegedly attempted to also have sexual intercourse with Roe II while she was sleeping. Doe I continues to deny both sexual-assault allegations.

To buttress his denial, Doe I claims that Roe I and Roe II gave several inconsistent statements to UC administrators and UC police officers regarding the incident. For example, Doe I alleges that Roe I gave inconsistent statements about whether she had smoked marijuana that night and whether she had, in fact, been asleep when Doe I got into bed with her. Likewise, Roe II allegedly gave inconsistent statements regarding her intoxication level on the night in question and whether she passed out before or after Doe I initiated intercourse with her.

Doe I also claims that he was fully cooperative with police investigators and that the police obtained significant evidence exonerating him, despite attempts by UC administrators to interfere with the police investigation. For example, Doe I challenges both Roe I's contention that she was unaware how Doe I got into her dorm and Roe II's claim that dormitory staff improperly let Doe I into the building by pointing to surveillance video showing that Roe I waited while Roe II signed Doe I into the dorm. Similarly, Doe I argues that neither Roe I nor Roe II appear intoxicated in the surveillance video despite Roe II's statements to the ARC panel that she was too intoxicated to remember walking home. Doe I also points to forensic cell-phone evidence showing that Roe I and Roe II sent text messages during the time they were allegedly

4

passed out, and later joked about the case. He also argues that another female student, who was allegedly present in the room when the assault occurred, denied witnessing anything illegal. Doe I also believes that the crime lab's assessment of the rape kits was consistent with his theory of events.

Doe I claims that Daniel Cummins, UC's Assistant Dean of Students and Director of the Office of Judicial Affairs, instituted disciplinary proceedings against him prior to investigating the credibility of the allegations. Doe I alleges that Cummins sent an initial letter explaining the charges on March 12, 2014, and later interviewed him in person on March 28. Doe I alleges that he denied the allegations at this meeting, but otherwise exercised his right to remain silent.

Doe I claims that Cummins scheduled an ARC hearing prior to interviewing any witnesses. Although the hearing was initially scheduled for April 10, 2014, it was later postponed until May 2, 2014. Prior to the hearing, Cummins completed an investigative report, which concluded that Doe I had engaged in sexual activity with Roe I and Roe II without their consent. Doe I claims that Cummins's investigative report had several crucial omissions:

1. It did not include a review of the physical evidence obtained by UC Police.

2. It failed to include Doe I's statements to UC Police.

3. It excluded a witness's statement that Roe I and Roe II had been "pretty flirtatious" with Doe I and had "basically dragged" him back to their dorm.

4. It did not include any of the physical evidence that tended to exonerate Doe I, such as the surveillance videos and text messages.

*Id.* at 33–34.

Doe I also claims that the initial ARC hearing on May 2, 2014, had numerous procedural deficiencies:

1. UC did not respond to Doe I's attorney's request that the UC Police investigator be present at the hearing.

5

2. UC did not permit Doe I to introduce relevant evidence from the UC Police investigation, such as the rape-kit analysis, text messages, surveillance video, or police report.

3. Doe I was not allowed to impeach a witness, Roe I's boyfriend, who lacked firsthand knowledge of the incident.

4. Doe I was not allowed to personally record the hearing.

5. The ARC hearing chair refused to ask witnesses relevant questions that Doe I submitted.

6. The ARC hearing chair refused to compel the attendance of UC police officers who investigated Doe I's case.

7. The ARC panel refused to consider a binder of evidence Doe I submitted that allegedly supported his version of the events.

Doe I claims that these deficiencies led the ARC panel to find that Doe I had violated UC's Code of Conduct with respect to Roe I's claims. Doe I left the ARC hearing before the panel considered Roe II's allegations because he determined he would not be afforded due process.

Doe I appealed the ARC panel's findings. On appeal, UC determined that substantial procedural errors had occurred and granted Doe I a new hearing. The new hearing took place on May 18–19, 2015. Although Doe I concedes that his second hearing was not the same "kangaroo court[]" as before, he alleges it still lacked significant procedural protections:

1. The panel improperly considered Cummins's allegedly biased investigative report.

2. The panel was not advised that Doe I was presumed innocent or that the complainants bore the burden of proof.

3. The panel refused to ask the complainants a number of written questions that Doe I submitted and that were intended to highlight inconsistencies in the complainants' stories.

4. Doe I was not permitted to make his own recording of the hearing.

5. Doe I was given access to a university advisor at late notice, while the complainants received access to an advisor at an earlier date.

6. The panel heard "impact statements" from the complainants prior to adjudicating Doe I's responsibility.

7. Doe I was not provided advanced notice of the evidentiary rules that would be employed at the hearing.

8. UC failed to provide the panel with information regarding alleged academic accommodations that were provided to the complainants throughout the investigation, accommodations that Doe I claims may have affected their credibility.

*Id.* at 38–41.

On rehearing, the ARC panel found Doe I "responsible" for violating UC's Code of Conduct with respect to Roe I, but "not responsible" with respect to Roe II. *Id.* at 41. Doe I claims that no explanation was given for the inconsistent decision. Doe I's appeal—including his claim that the ARC panel erroneously allocated the burden of proof—was rejected by UC's Appeal Administrator, Denine Rocco. In response to Doe I's burden-of-proof argument, Rocco stated that, "Neither party has any burden of proof. Instead, the ARC [panel] uses the hearing to investigate what happened and then makes a finding based on the preponderance of evidence." *Id.* at 41–42. Rocco affirmed the ARC panel's decision on July 23, 2015. As a result of the responsibility finding, Doe I received a three-year suspension from UC. He has since transferred to another educational institution.

### C.

In March 2014, John Doe II was a law student at UC. On March 6, 2014, Cummins received a report from Jane Roe III that she had been sexually assaulted by Doe II. Doe II claims that although Roe III did not report this matter to police, a police report was created at the behest of Cummins. Following her allegations, Roe III also allegedly received accommodations, including additional time to complete her graduate thesis. Like Doe I, Doe II claims that he was

7

subject to various "interim measures," including restricted access to certain campus buildings. *Id.* at 44.

Doe II claims that Cummins first notified him of the charges on March 17, 2014, and that he had a formal, in-person meeting with Cummins to discuss the allegations on March 26, 2014. Following this meeting, Cummins completed an investigatory report, which allegedly misrepresented Doe II's statements. Doe II claims that he was not given access to this report prior to his ARC hearing.

Doe II's ARC hearing was held on April 22, 2014. Because Doe II's advisor had a conflict, he was able to attend only part of the hearing. Doe II alleges that Cummins refused to accommodate his advisor's request for a different hearing date. Like Doe I, Doe II claims that his initial ARC hearing was procedurally deficient in several ways:

1. The panel heard a victim "impact statement" prior to an adjudication of responsibility.

2. The panel misapplied the definition of "consent" and other legal terms as set forth in UC's Title IX policy.

3. The panel permitted witnesses to make prejudicial statements and offer their own legal conclusions.

4. A Title IX expert was not permitted to testify about the proper legal definition of terms such as "consent."

5. Doe II was not permitted to effectively cross-examine adverse witnesses because questions were required to be submitted in writing through the panel and no follow-up was allowed.

6. Unreliable hearsay evidence was admitted at the hearing.

7. The panel did not receive any evidence substantiating Roe III's claim that she was intoxicated.

*Id.* at 46–47. Doe II was found "responsible" for violating UC's Code of Conduct with respect to Roe III's claims. *Id.* at 48. On appeal, Doe II was granted a new ARC hearing.

8

The second ARC hearing was held on October 28, 2014. Doe II claims that the second hearing was permeated with many, if not all, of the same procedural defects that plagued the first hearing. He also claims that Roe III told Doe II that he was a "rapist" and was "going to Hell" during her victim-impact statement. *Id.* Following these comments, Roe III allegedly "stormed out of the hearing," which precluded any opportunity for Doe II to cross-examine her. *Id.* at 49.

The ARC panel again found Doe II "responsible" for a Code-of-Conduct violation. *Id.* Doe II alleges that he was not allowed to appeal this finding but claims that Rocco affirmed this decision on November 10, 2014. As a result, Doe II was placed on disciplinary probation and required to complete and submit a seven-page research paper. Doe II has since graduated from UC's law school, but claims that the negative notation in his academic record may affect future employment opportunities or bar admission in other states.

D.

In October 2015, Doe I and Doe II filed suit in the District Court for the Southern District of Ohio against UC and several of its administrators for allegedly mishandling their sexual-assault disciplinary proceedings. They sought declaratory and injunctive relief under 42 U.S.C. § 1983 against UC and the individual defendants in their official capacities. They also sought damages from the individual defendants in their personal capacities, alleging violations of their Fourteenth Amendment due-process rights. In addition, Doe I and Doe II sought damages and equitable relief from UC under Title IX, arguing that the adverse outcomes in their UC disciplinary proceedings were the result of gender discrimination.

UC and the individual defendants filed a motion to dismiss. The district court granted the motion to dismiss on all claims. Specifically, the district court concluded that the procedures provided to Doe I and Doe II in the adjudication of their sexual-assault cases met the minimum

9

requirements of due process as required by the Fourteenth Amendment. The district court also found that, irrespective of any due-process concerns, the individual defendants were entitled to qualified immunity for appellants' § 1983 damages claims. Finally, the district court found that appellants' complaint failed to allege sufficient facts to raise a plausible inference of gender discrimination under Title IX. Doe I and Doe II timely appealed.

## II.

We review *de novo* a district court's dismissal of a plaintiff's complaint for failure to state a claim under Rule 12(b)(6). *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006). To survive a Rule 12(b)(6) motion, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard is not a "probability requirement," but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* We must construe the complaint in a light most favorable to the plaintiff, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor. *Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007). It is not, however, required that we accept the plaintiff's legal conclusions as true, and thus "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III.

The district court held that appellants' claims for declaratory relief against the individual defendants in their official capacities were barred by the Eleventh Amendment, but that their claims for declaratory relief against these officials in their personal capacities were not so barred.

Appellees argue that the Eleventh Amendment precludes all claims for declaratory relief against the individual defendants, both in their official and personal capacities. Although we believe the district court erred in limiting the availability of declaratory relief to only those claims made against the individual defendants in their personal capacities, we agree that the Eleventh Amendment does not bar the declaratory relief sought here.

The Eleventh Amendment bars suits for money damages against the State, arms of the State, and state officials acting in their official capacities. *See Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003). Suits for equitable relief against the State and its departments are also prohibited. *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012). Suits for injunctive and declaratory relief against state officials acting in their official capacities, however, are permitted in limited circumstances. *See Ex Parte Young*, 209 U.S. 123, 155–56 (1908); *Edelman v. Jordan*, 415 U.S. 651, 666–69 (1974). Whether the Eleventh Amendment bars such suits turns on the nature of the relief sought. *See Edelman*, 415 U.S. 651, 666–69. The Eleventh Amendment does not bar relief that is prospective in nature and designed to ensure future compliance with federal law. *Id.* Retroactive equitable relief against state officials—often involving compensatory payments from the state treasury—however, is precluded by the Eleventh Amendment because it is effectively a suit against the state itself. *Nelson v. Miller*, 170 F.3d 641, 646 (6th Cir. 1999).

Because Doe I and Doe II are seeking prospective equitable relief, their claims are not barred by the Eleventh Amendment. Appellants are requesting an injunction against the individual defendants in their official capacity "prohibiting the imposition of, or reporting of, any disciplinary actions under the UC Code of Student Conduct." DE 1, Compl., Page ID 63. If successful, this claim would not require the court to grant any retroactive or compensatory

remedy. Rather, the individual defendants would merely be compelled to remove the negative notation from appellants' disciplinary records that resulted from the allegedly unconstitutional disciplinary process. This is nothing more than prospective remedial action. *See Thomson v. Harmony*, 65 F.3d 1314, 1321 (6th Cir. 1995) (holding that an injunction requesting the removal of negative entries from a personnel record resulting from an alleged due-process violation was not barred by the Eleventh Amendment); *Flint v. Dennison,* 488 F.3d 816, 825 (9th Cir. 2007) (finding negative entries in a student's university records stemming from an allegedly unconstitutional action presented a continuing violation sufficient to trigger the *Ex Parte Young* exception). Importantly, this relief imposes no monetary burden on the state itself, a factor often dispositive when examining the availability of injunctive relief under the Eleventh Amendment. *See Edelman*, 415 U.S. at 663–66. Accordingly, the Eleventh Amendment does not bar the injunctive relief at issue here. *See Thomson*, 65 F.3d at 1321.

Appellees nevertheless argue that appellants' request for a declaratory judgment that the individual defendants violated the Due Process Clause is barred under the Eleventh Amendment because it targets past conduct. Such relief, however, is permissible under the Eleventh Amendment. Standing alone, this type of declaratory relief would likely be barred given its retroactive nature. *See Brown v. Strickland*, No. 2:10-cv-166, 2010 WL 2629878, at *4 (S.D. Ohio June 28, 2010) ("[A] declaratory judgment against state officials declaring that they violated federal law in the past constitutes retrospective relief. . . ."). Such relief, however, is permitted when it is ancillary to a prospective injunction designed to remedy a continuing violation of federal law. *See Green v. Mansour*, 474 U.S. 64, 67–73 (1985); *Banas v. Dempsey*, 742 F.2d 277, 286–88 (6th Cir. 1984). Accordingly, we find such declaratory relief against the individual defendants is also allowed under the Eleventh Amendment.

IV.

The district court dismissed appellants' due-process claims, holding that the alleged deficiencies in UC's disciplinary procedures did not constitute a violation of their due-process rights. Appellants appealed, arguing that numerous procedural deficiencies resulted in a disciplinary process that deprived them of property and liberty interests without due process.

Doe I and Doe II claim that the procedural deficiencies pervading UC's disciplinary process deprived them of a fundamentally fair hearing and a meaningful opportunity to be heard. In their complaint, appellants allege that UC engaged in numerous procedures that violated their due-process rights, including: (1) conducting biased investigations; (2) improperly admitting hearsay evidence without providing appellants the opportunity to effectively cross-examine hearsay witnesses; (3) permitting the ARC panel to hear impact statements prior to adjudicating responsibility; (4) improperly applying UC's policies and Code of Conduct at the hearing;[2] (5) not allowing effective cross-examination of adverse witnesses; (6) denying effective assistance of counsel due to the inability of counsel to participate in the hearing; (7) improperly allocating the burden of proof at the hearing; and (8) utilizing an inherently biased panel that routinely finds in favor of victims.[3] Appellees contend that appellants received constitutionally sufficient procedures, namely, notice of the charges, an explanation of the evidence against them, and a meaningful opportunity to present their side of the story. For the reasons set out below, we

---

[2] Given that the Constitution—and the case law interpreting it—mandates what procedures are constitutionally required following the deprivation of a property or liberty interest, and not internal school rules or policies, this argument clearly lacks merit. *See Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 570 (6th Cir. 2011) (holding that the violation of school policies or state law does not create a cognizable due-process claim in federal court); *Hall v. Med. Coll. of Ohio*, 742 F.2d 299, 309 (6th Cir. 1984) (holding that a school's violation of its own internal rules is of no constitutional moment).

[3] Appellants claim that "[a]n ARC Hearing Panel has never failed to recommend that a student be found responsible and significant discipline be imposed." DE 1, Compl., Page ID 58. Like the district court, we take this to mean that appellants are alleging they faced a disciplinary panel that was inherently biased against them.

affirm the district court because appellants received sufficient due process under the Fourteenth Amendment.

A.

The Constitution requires certain minimum procedures before an individual is deprived of a "liberty" or "property" interest within the meaning of the Due Process Clause of the Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). We have recognized that these protections apply to higher education disciplinary decisions. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005). Doe I's suspension clearly implicates a property interest. *See Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245, 1247–48 (E.D. Mich. 1984). And although Doe II was not deprived of a property interest under the Due Process Clause because he was not suspended, the adverse disciplinary decision did, and continues to, impugn his reputation and integrity, thus implicating a protected liberty interest. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (holding that where "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the minimal requirements of due process must be satisfied).

Once we conclude that due process applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). We answer this question by applying the framework articulated by the Supreme Court in *Mathews*, 424 U.S. at 335. *See Flaim*, 418 F.3d at 634.

Under *Mathews*, the level of process the Fourteenth Amendment requires is determined by balancing three factors: (1) the nature of the private interest affected by the deprivation; (2) the risk of an erroneous deprivation in the current procedures used, and the probable value, if any, of additional or alternative procedures; and (3) the governmental interest involved,

including the burden that additional procedures would entail. *Mathews*, 424 U.S. at 335. Although the inquiry should be flexible, due process requires, at a minimum, "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In the school-disciplinary context, an accused student must at least receive the following pre-expulsion: (1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker. *Heyne*, 655 F.3d at 565–66 (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). We have recognized, however, that "disciplinary hearings against students . . . are not criminal trials, and therefore need not take on many of those formalities." *Flaim*, 418 F.3d at 635. Although a university student must be afforded a meaningful opportunity to present his side, a full-scale adversarial proceeding is not required. *See id.* at 640. The focus, rather, should be on whether the student had an opportunity to "respond, explain, and defend," and not on whether the hearing mirrored a criminal trial. *Id.* at 635 (quoting *Gorman v. Univ. of R.I.*, 837 F.2d 7, 13 (1st Cir. 1988)). With these principles in mind, we turn to the *Mathews* framework.

B.

The first factor to be weighed under *Mathews* is the nature of the private interest at stake. *Mathews*, 424 U.S. at 335. Here, both Doe I and Doe II were accused of serious sexual offenses. A finding of responsibility will thus have a substantial lasting impact on appellants' personal lives, educational and employment opportunities, and reputations in the community. *See Goss*, 419 U.S. at 574–75. Accordingly, appellants' private interests are compelling. This is especially true for Doe I, who received a three-year suspension. Doe II's interest, however, while still significant, is slightly diminished given that he was placed only on "university disciplinary probation," and not suspended or expelled. DE 1, Compl., Page ID 49.

C.

The strength of appellants' private interests, however, is not the end of the inquiry. We must also consider the other two factors in the *Mathews* framework. To do so, we balance appellants' private interests against the "additional procedures requested, any error-reducing benefit those procedures might have, and the burden on [the University] of adding those additional procedures." *Flaim*, 418 F.3d at 638. In analyzing the sufficiency of UC's procedures, we review each alleged deficiency in isolation for purposes of analytical clarity. The focus of our analysis, however, is not whether each procedural protection is required, but rather what protections, as a whole, were required in this case.

In reviewing appellants' due-process claims, we agree with the district court that, "to the extent that [Doe I and Doe II] base their due process claims on alleged defects in their first hearings, those alleged errors were harmless because their appeals were sustained and they both received new hearings." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601 (S.D. Ohio 2016). Thus, although both Doe I and Doe II allege that numerous procedural deficiencies existed in their first ARC hearings, those defects were cured by UC's decision to grant their appeals, vacate the finding of responsibility, and provide each a second hearing. *See Harper v. Lee*, 938 F.2d 104, 105–06 (8th Cir. 1991) (finding that administrative reversal and grant of new disciplinary hearing rectified any procedural deficiencies in an inmate's initial hearing); *see also Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992). Accordingly, the relevant procedures for purposes of our *Mathews* analysis are those employed by UC in appellants' most recent hearings.

1.

There is no question that both Doe I and Doe II received adequate notice of the charges against them. Doe I concedes that he received written notice of the charges against him on

March 12, and had a follow-up meeting with Cummins on March 28 to discuss the allegations. This was a full month before his first ARC hearing on May 2. Similarly, Doe II states that Cummins notified him in writing of the allegations against him on March 17, and that he had a follow-up meeting with Cummins to discuss the charges on March 26. This was also a full month before Doe II's initial ARC hearing on April 22. This dual form of notice was sufficiently formal and timely to satisfy due-process requirements and provide appellants with a meaningful opportunity to prepare a defense. *See Flaim*, 418 F.3d at 638 ("Notice satisfies due process if the student had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." (quoting *Jaksa*, 597 F. Supp. at 1250)).

2.

Appellants make several arguments regarding the procedures actually employed at their ARC hearings, all of which ultimately fail to state a due-process violation. First, appellants challenge the use of hearsay evidence without adequate safeguards. Appellants' complaint, however, fails to indicate what hearsay was actually allowed against them in their hearings. The only reference to the use of hearsay involves appellants' initial hearings. As discussed above, any procedural deficiencies in appellants' initial hearings were cured when they received new hearings. Because there is no claim that hearsay evidence was introduced in the second hearings, this allegation is irrelevant to our analysis.

Second, appellants claim that the ARC panel erred by allowing the introduction of victim-impact statements prior to adjudicating responsibility. While due process does not necessarily require that formal "rules of evidence, [or] rules of civil or criminal procedure" be applied in a school-disciplinary setting, *Flaim*, 418 F.3d at 635, this allegation is potentially problematic under *Mathews*. Exposure to victim-impact statements prior to an adjudication on

17

the merits may prejudice the accused and lead to an erroneous outcome based on emotion, as opposed to reason. This is especially true in Doe II's case given that the victim testified that Doe II was "a rapist" and was "going to Hell." DE 1, Compl., Page ID 48. But UC has a strong interest in avoiding the bifurcation of proceedings into multiple phases—i.e., a guilt phase and a punishment phase—that would add time, expense, and complexity to every disciplinary hearing. Additionally, there were procedural protections in place to counteract any potential for error from allowing the victims' statements, including the panel's ability to make credibility determinations of the victims' statements and appellants' own opportunity to refute the victims' accounts. Moreover, the limited prejudicial impact of allowing the ARC panels to consider the victim-impact statements prior to determining appellants' responsibility is illustrated in this case. Although the victim's statements in Doe II's hearing were more prejudicial than those in Doe I's, Doe II ultimately received a more lenient punishment. On balance, therefore, we find that the introduction of victim-impact statements prior to determining appellants' responsibility did not impact appellants' due-process rights under *Mathews*.

Third, appellants claim that they were denied effective cross-examination of witnesses because they were allowed to submit only written questions to the ARC panel, the panel did not ask all of the questions they submitted, and they were not allowed to submit follow-up questions. Although due process may require a limited ability to cross-examine witnesses in school disciplinary hearings where, like here, credibility is at issue, *see Flaim*, 418 F.3d at 641 (citing *Winnick v. Manning*, 460 F.2d 545, 549–50 (2d Cir. 1972)), that requirement was satisfied in this case. Any marginal benefit that would accrue to the fact-finding process by allowing follow-up questions in appellants' ARC hearings is vastly outweighed by the burden on UC. *See Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 926 (6th Cir. 1988) ("To saddle [school officials] with

the burden of overseeing the process of cross-examination (and the innumerable objections that are raised to the form and content of cross-examination) is to require of them that which they are ill-equipped to perform."). Moreover, the circumscribed form of cross-examination utilized in appellants' hearings has been found constitutionally sufficient under *Mathews* in one of our sister circuits. *See Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987) (holding that there "was no denial of appellants' constitutional rights to due process by their inability to question the adverse witnesses in the usual, adversarial manner").

Doe II's argument on this point, however, is stronger given he was not permitted to cross-examine Roe III, in any form, during his second hearing. But his claim that cross-examination was required still fails for two reasons. First, as mentioned above, Doe II's private interest under *Mathews*'s first prong is diminished because he was not facing expulsion, only disciplinary probation. Thus, the requisite level of procedural formalities for Doe II was not as high as was required for Doe I, who was facing a serious suspension.[4] *See Goss*, 419 U.S. at 584 ("Longer suspensions or expulsions . . . may require more formal procedures."). Second, it appears that Doe II did have the chance to cross-examine Roe III in his initial hearing in the presence of several panel members who then presided over his second hearing. Although it is unclear to what extent these panel members relied on this initial cross-examination in reaching their conclusions in the subsequent hearing, taken together, these two facts preclude a due-process violation in Doe II's case.

Fourth, appellants contend that they were denied due process because their advisors were not allowed to actively participate in their hearings despite being able to attend them. We have recognized that a student may have a constitutional right to counsel in academic disciplinary

---

[4] In fact, the negative entry in Doe II's disciplinary record has not prevented him from graduating law school or passing the Ohio Bar Exam.

proceedings where the hearing is unusually complex or when the university itself utilizes an attorney. *See Flaim*, 418 F.3d at 640 (citing *Jaksa*, 597 F. Supp. at 1252). Neither scenario is present here. And appellants fare no better under *Mathews* balancing. Although appellants' advisors were not allowed to actively participate in the hearing, they were still permitted to be present and advise appellants in presenting their cases. The added benefit of allowing active participation by an advisor here is minimal given the limited cross-examination of witnesses, the lack of complexity, and the fact that knowledge of evidentiary rules was not required. Moreover, the burden on UC of allowing this level of participation by counsel in every disciplinary hearing would be significant due to the added time, expense, and increased procedural complexity. *See Flaim*, 418 F.3d at 640–41 ("Full-scale adversarial hearings in school disciplinary proceedings have never been required by the Due Process Clause and conducting these types of hearings with professional counsel would entail significant expense and additional procedural complexity."). The inability of appellants' advisors to actively participate in their hearings, therefore, does not present a due-process violation under *Mathews*.

Finally, appellants allege that it was constitutional error to fail to place the burden of proof on their accusers, effectively requiring appellants to prove their innocence. Although the locus of the burden of proof can frequently be dispositive to the outcome of a case, the Supreme Court has concluded that "[o]utside the criminal law area," which party bears the burden of proof "is normally not an issue of federal constitutional moment." *Lavine v. Milne*, 424 U.S. 577, 585 (1976).

Under *Mathews*, however, placing the burden of proof on the appellants may have proven constitutionally suspect due to the potentially detrimental effect on the accuracy of the hearing and the minimal burden of an alternate procedure. But, as the district court recognized, the facts

20

alleged in appellants' complaint tend to show that the ARC panel did not place the burden of proof on either party. Rather, the panel functioned as a board of inquiry, reaching its conclusion based on a preponderance of the evidence. Allocating the burden of proof in this manner—in addition to having other procedural mechanisms in place that counterbalance the lower standard used (e.g., an adequate appeals process)—is constitutionally sound and does not give rise to a due-process violation.

3.

Appellants' most ubiquitous argument is that the entire UC disciplinary process was inherently biased against them, resulting in a fundamentally unfair process. It is unquestioned that a fundamental due-process requirement is an impartial and unbiased adjudicator. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Heyne*, 655 F.3d at 566.[5] It is also well established that school-disciplinary committees are entitled to a presumption of impartiality, absent a showing of actual bias. *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 256 (6th Cir. 2005) ("[I]n a 'university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias.'" (quoting *McMillan v. Hunt*, No. 91-3843, 1992 WL 168827, at \*2 (6th Cir. July 21, 1992))); *cf. Withrow*, 421 U.S. at 47. Thus, "[a]ny alleged prejudice on the part of the [decisionmaker] must be evident from the record and cannot be based in speculation or inference." *Nash*, 812 F.2d at 665.

Appellants make several allegations regarding UC's disciplinary process that they claim evince a bias against those accused of sexual misconduct. First, appellants claim that, due to pressure from the Department of Education, UC employs a biased investigatory process in order

---

[5] Given that the constitutional requirement of an unbiased decisionmaker is absolute and does not vary based on the facts of the case, *Mathews* is inapplicable to this alleged procedural defect. Accordingly, a finding of partiality and bias would automatically trigger a due-process violation, irrespective of any balancing of interests. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (noting that a "biased decisionmaker" in the administrative context is "constitutionally unacceptable").

to "look good" for the Department and preserve federal funding. CA6 R.16, Appellants' Br., at 28–29. As the district court correctly observed, this is nothing more than a conclusory allegation devoid of any facts or evidence that UC, itself, has been subjected to any direct investigation or pressure by the Department of Education.[6] *See Iqbal*, 556 U.S. at 678 (noting that courts are not required to accept conclusory statements as true); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 377 (6th Cir. 2011) (finding that "vague and conclusory allegations of nefarious intent and motivation by officials at the highest levels of the federal government" are insufficient to state a claim under *Iqbal*).

Next, appellants assert that Cummins displayed biased behavior against them, including: (1) seeking accommodations for the alleged victims while simultaneously investigating their allegations; and (2) preparing a biased investigatory report that excluded exculpatory evidence. With respect to the allegedly improper accommodations, these are required by federal regulations. *See* 34 C.F.R. § 668.46(b)(11)(v). Complying with these regulations, therefore, is not evidence of Cummins's bias. Moreover, any claim regarding the allegedly biased investigative report is weakened by the fact that Cummins did not ultimately serve on the ARC panels that adjudicated appellants' culpability. Instead, appellants' responsibility was adjudicated by an independent panel that considered all of the evidence allegedly left out of Cummins's investigative report. Accordingly, even if Cummins's initial investigations of the incidents were biased, those defects were cured by the ARC panel's subsequent handling of appellants' cases.

Finally, appellants allege a general bias by ARC panel members against students accused of sexual misconduct. They claim that the panel members received biased training that

---

[6] The complaint states that the federal government is investigating at least 129 schools for possible Title IX violations related to sexual assaults and then lists several schools that are the subject of those investigations. Notably absent is the University of Cincinnati.

emphasized the rights of the complaining party over the due-process rights of the accused, and that the panel members had a history of finding in favor of victims in sexual-misconduct cases. These allegations are belied by the process appellants received. In both cases, the initial responsibility determination was reversed on appeal for inadequate hearing procedures. This demonstrates a system that places much importance on the due-process rights of the accused at the expense of losing a finding in favor of the accuser. Furthermore, Doe I was ultimately found "not responsible" for the allegations made by Roe II. It is difficult to explain how the ARC panel was biased against Doe I in finding him "responsible" for Roe I's allegations but not biased against him in finding him "not responsible" for Roe II's allegations. Overall, this argument is untenable. Accordingly, we find that appellants' claims of bias in UC's disciplinary process lack constitutional merit.[7]

4.

Although not perfect, the process afforded to Doe I and Doe II comports with the Due Process Clause of the Fourteenth Amendment. *See Flaim*, 418 F.3d at 637 ("[T]he requirements mandated by the Due Process Clause afford, 'if anything, less than a fair minded school administrator would impose upon himself in order to avoid unfair decisions.'" (quoting *Goss*, 419 U.S. at 538)). Appellants received adequate notice of the charges against them and a sufficient opportunity to prepare a defense. Regardless of whether appellants' initial hearings were permeated with procedural deficiencies, following an appeal, they each received new hearings without many of the same alleged deficiencies. At these new hearings, appellants were able to offer pertinent evidence and explain their version of the events. Appellants were also allowed to conduct modified cross-examination and have an advisor present at the hearing.

---

[7] Appellants also cite statistics that allegedly suggest a bias against men in UC's enforcement of Title IX. This argument also fails for reasons discussed *infra* Part V.

Although the procedures employed by UC did not rise to the level of those provided to criminal defendants, that level of process is not required in school-disciplinary proceedings. *See Flaim*, 418 F.3d at 635. At bottom, all that is required under the Due Process Clause is an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Appellants received that here. Accordingly, we affirm the district court's dismissal of appellants' due-process claims.[8]

V.

Appellants also allege that the adverse outcomes in their respective disciplinary hearings resulted from gender discrimination in violation of Title IX. The district court found that appellants' complaint failed to state a viable Title IX claim because it failed to create a plausible inference of gender discrimination on the part of UC. We agree.

Title IX prohibits educational institutions receiving federal funds from discriminating on the basis of gender. 20 U.S.C. § 1681(a)(1). Although we are not subject to a binding framework in evaluating a student's Title IX discrimination claim, we have previously looked to the Second Circuit's decision in *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994), which identified two categories of Title IX claims related to student-disciplinary hearings: "erroneous outcome" claims and "selective enforcement" claims.[9] *See Mallory v. Ohio Univ.*, 76 F. App'x 634, 638–39 (6th Cir. 2003). A successful "erroneous outcome" claim requires the plaintiff to show that the "outcome of [the] University's disciplinary proceeding was erroneous because of

---

[8] Because we find that there is no due-process violation, we need not reach the question of qualified immunity.

[9] As was the case with the appellant in *Mallory*, Doe I and Doe II ask us to adopt two additional categories of Title IX claims: (1) "deliberate indifference" claims and (2) "archaic assumptions" claims. Noting that the *Mallory* court assumed only, *arguendo*, that such categories apply, we decline to adopt them because neither is applicable here. *Mallory v. Ohio Univ.*, 76 F. App'x 634, 639 (6th Cir. 2003). The "archaic assumptions" standard appears limited to unequal athletic opportunities. *Id.* at 638–39; *see also Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 7254213, at *8 (S.D. Ohio Nov. 17, 2015) (noting that the archaic assumptions doctrine appears limited to unequal athletic opportunities). Additionally, appellants make no arguments with respect to the "deliberate indifference" standard. As such, any "deliberate indifference" claim is waived. *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("[A]rguments adverted to in only a perfunctory manner[] are waived.").

sex bias." *Id.* at 639; *see also Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 7254213, at *5 (S.D. Ohio Nov. 17, 2015) ("The gravamen of an erroneous outcome claim is that an 'innocent' person was wrongly found to have committed an offense because of his or her gender."). To prevail on a "selective enforcement" claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender. *Mallory*, 76 F. App'x at 641; *Marshall*, 2015 WL 7254213, at *6.

Appellants' claims are most appropriately analyzed under the "erroneous outcome" standard.[10] Under this standard, "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf*, 35 F.3d at 715. Instead, to state an erroneous-outcome claim, a plaintiff must plead: (1) "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) a "particularized . . . causal connection between the flawed outcome and gender bias." *Id.* Causation sufficient to state a Title IX discrimination claim can be shown via "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* Because appellants have failed to show any causal connection between the adverse outcomes in their hearings and gender bias, they have not met their burden here. Accordingly, their Title IX claims fail.

Appellants first contend that, in order to appease the Department of Education, UC adopted a practice of investigation and enforcement under Title IX that is inherently biased against male students accused of sexual assault. This claim is unfounded. First, to the extent appellants claim that the accommodations offered to the complainants during the investigatory

---

[10] Because appellants do not allege that a similarly accused female was treated differently under UC's disciplinary process, the "selective enforcement" standard is inapplicable.

process are evidence of gender bias, these claims fail because such accommodations were required by federal regulations. *See supra* Part IV.C.3. Second, unlike the allegations in the cases relied on by appellants, the allegations in appellants' complaint are mere conclusory statements, unsupported by sufficient factual allegations to make their claims plausible.

For example, *Doe v. Columbia University*, No. 15-1536, 2016 WL 4056034 (2d Cir. July 29, 2016), involved additional facts substantiating the plaintiff's claim that federal-government influence had led to gender bias in the university's enforcement proceeding. In that case, Columbia University, in the weeks leading up to the plaintiff's hearing, had faced substantial criticism from both the student body and the public media regarding its handling of sexual-assault investigations. *Id.* at \*8. The effect of this criticism was evident from the university president's decision to call a campus-wide town hall for students to discuss the issue with the dean of the university. *Id.* The plaintiff's complaint in *Columbia University* also alleged that the Title IX investigator—the position occupied by Cummins at UC—was herself subject to public criticism in the weeks prior to the hearing. *Id.* at \*9. The Second Circuit concluded that these additional facts were sufficient to support an inference that pressure to avoid Title IX liability and further public criticism had led to a disciplinary system that was biased against males. *Id.* at \*8–9.

Appellants fail to allege similar supporting facts here. They do not allege that UC or any of its officials had faced public criticism for their handling of Title IX investigations prior to appellants' hearings. Nor do appellants allege that UC—unlike Columbia University—was being investigated by the federal government for potential Title IX violations. Instead, appellants allege more generally that the Department of Education's "Dear Colleague Letter" induced UC to discriminate against males in sexual-assault investigations in order to preserve

federal funding. This conclusory allegation, without more, is insufficient to create a plausible claim of gender bias under Title IX.

Appellants next claim that UC's alleged due-process violations—e.g., the limited right to cross-examination, the limited access to an advisor, and the improper allocation of the burden of proof—evidence gender discrimination in UC's disciplinary process. Appellants, however, fail to show how these alleged procedural deficiencies are connected to gender bias. As noted by the district court, these deficiencies at most show a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct.[11] But this does not equate to gender bias because sexual-assault victims can be both male and female. *See Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."). Accordingly, without additional facts linking these alleged procedural deficiencies to gender bias, these procedural defects do not create a plausible inference of gender discrimination under Title IX. *See Yusuf*, 35 F.3d at 715 ("Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.").

Finally, appellants cite statistics that they allege evince a pattern of discrimination against males in UC's investigation and adjudication of sexual-misconduct claims. Specifically, appellants claim that since 2011 there have been nine sexual-assault investigations at UC, and in all nine cases, the accused was male and was ultimately found responsible. Like appellants' other claims, this allegation fails to create a plausible inference of gender bias.

---

[11] Although appellants attack this portion of the district court's opinion as evidence of a due-process violation, we concluded that UC's disciplinary process was not inherently biased, and thus complied with the minimum requirements of due process. *See supra* Part IV.C.3.

First, as the district court aptly observed, appellants fail to eliminate the most obvious reasons for the disparity between male and female respondents in UC sexual-misconduct cases: "(1) UC has only received complaints of male-on-female sexual assault, and (2) males are less likely than females to report sexual assaults." *Univ. of Cincinnati*, 173 F. Supp. 3d at 607–08. It would be unreasonable, therefore, for us to infer that the gender disparity in UC's sexual-misconduct cases is the result of gender bias, as opposed to these other, more innocent causes. *See Girgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 843 (N.D. Ohio 2010) ("While it is true that, in considering a motion to dismiss, all well-pleaded factual allegations must be taken as true, a court need not indulge in unreasonable inferences." (citations and internal quotations omitted)); *cf. King v. DePauw Univ.*, No. 2:14–cv–70–WTL–DKL, 2014 WL 4197507, at *11 (S.D. Ind. Aug. 22, 2014) (noting that a university "is not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct" (emphasis in original)).

Second, nine cases is hardly a sufficient sample size for this court to draw any reasonable inferences of gender bias from these statistics. *See Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (finding sample size of seventeen cases insufficient to support an inference of discrimination in the employment context). Finally, appellants' own treatment belies their argument that men are invariably found responsible in UC sexual-assault investigations: Doe I was found "not responsible" for Roe II's allegations. These statistics, therefore, are insufficient to show a pattern of decisionmaking suggesting the influence of gender in the UC disciplinary process. *See Yusuf*, 35 F.3d at 715.

Because appellants have failed to create a reasonable inference that gender bias affected the outcome of their respective proceedings, we affirm the district court's finding that appellants have failed to state a plausible Title IX gender-discrimination claim.

VI.

For the reasons stated above, we affirm.