**REVISED June 26, 2017**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-20350

United States Court of Appeals
Fifth Circuit

**FILED**

June 23, 2017

Lyle W. Cayce
Clerk

NATALIE PLUMMER; RYAN MCCONNELL,

Plaintiffs - Appellants

v.

UNIVERSITY OF HOUSTON; RICHARD BAKER; RICHARD WALKER,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, WIENER, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

The University of Houston found two former students, Ryan McConnell and Natalie Plummer, to have violated the University's sexual misconduct policy. After two unsuccessful administrative appeals, McConnell and Plummer were ultimately expelled. McConnell and Plummer then sued the University and two University officials, alleging that they were denied constitutional due process and were discriminated against in violation of Title IX. The district court granted summary judgment to the University and the individual defendants, holding that no due process violation occurred and

No. 15-20350

that the individual defendants were entitled to qualified immunity. The district court dismissed the Title IX claims under Rule 12(b)(6). Finding no reversible error, we affirm.

I

McConnell and Plummer were students at the University of Houston in 2011. On the night of November 19, 2011, McConnell met, for the first time, "Female UH Student" at a bar in Houston. Both McConnell and Female UH Student became intoxicated. They were ejected from the bar for disruptive behavior and walked to McConnell's nearby dorm room. There, they engaged in sexual activity, but neither can remember exactly what occurred.

Later that evening, McConnell's girlfriend (now wife), Plummer, appeared at his dorm room and found McConnell and Female UH Student, both naked and unconscious on the floor. Plummer yelled expletives and took a photo of the two, which she posted on Facebook but removed sometime later. Plummer also made two brief videos. In one, the "Dorm Room Video," a drowsy McConnell appears to fondle the unresponsive Female UH Student as she lies on the dorm room floor and Plummer crudely berates him. After McConnell stands up, Plummer focuses the camera on Female UH Student's vagina and yells several lewd statements, including "Fucking yeah, yeah. Fucking get it, get it. Fucking get that pussy, bitch!" Simultaneously, slapping sounds can be heard in the background. In the other, the "Elevator Video," Plummer films Female UH Student, who is still fully naked, lying on the dormitory's communal hallway floor. Female UH Student stands up and walks toward Plummer, and Plummer leads the nude Female UH Student into an elevator and sends it to the lobby. Voices can be heard speaking throughout the video, but the precise statements are often unclear. Plummer later showed the videos to her friends and shared the videos and photo electronically.

No. 15-20350

Other students found Female UH Student lying naked in the elevator, and they contacted University police. A Sexual Assault Nurse examined Female UH Student and found injuries consistent with sexual assault. Police investigated the incident, but did not criminally charge McConnell or Plummer.

On February 12, 2012, Female UH Student submitted a complaint to the University alleging that she was a victim of sexual assault. Richard Baker, the Vice President of the University's Office of Equal Opportunity Services (EOS), notified McConnell that EOS was investigating the incident. Thereafter, McConnell and Plummer met with Baker to discuss the incident and provide their side of the story. At her meeting with Baker, Plummer presented the photo she took of McConnell and Female UH Student, as well as the Elevator Video. Plummer did not disclose the Dorm Room Video. Based on the evidence gathered, the University did not proceed with disciplinary actions at that time. More than a year and a half later, however, the University received a copy of the Dorm Room Video from the Harris County Sheriff's Office and then decided disciplinary proceedings were warranted.

The University provided both McConnell and Plummer with a formal, written declaration of the various allegations against them on September 30, 2013.[1] Each student retained counsel, who formally responded to the charges and accompanied McConnell and Plummer to meetings with Baker. McConnell reported that he remembered nothing after he and Female UH Student arrived at his dorm room but denied sexually assaulting her. Plummer insisted that her actions were motivated by anger at her boyfriend, not an attempt to

---

[1] At some point, Female UH Student decided not to pursue her complaint, and thus the University was the "Complainant" in both proceedings as provided for by the University's procedures.

3

encourage him to assault Female UH Student. She also asserted that Female UH Student, when awakened, was pressing to "sex" her.[2]

After completing his investigation, Baker authored a report finding that McConnell "violated the sexual assault and attempted sexual assault provisions . . . when he engaged in sexual activity with [Female UH Student] on November 19, 2011, without her consent."[3] Baker also found that Plummer "facilitated/encouraged the sexual assault of another [UH] student[,]" "electronically recorded the sexual activity of another [UH] student and then shared that video . . . without that student's permission[,]" and "made lewd, lecherous and humiliating comments of a sexual nature against another [UH] student."

Pursuant to the University's procedures, each student appealed Baker's findings to a four-person panel of University personnel. The panels, tasked with upholding or rejecting EOS's findings based on a preponderance of the evidence standard, held separate appeal hearings for McConnell and Plummer. Neither student attended the other's full hearing, although Plummer testified as a witness at McConnell's hearing. Baker, an attorney, presented his findings to the panel, including by testifying about his investigation and providing a packet of investigatory materials. He called two witnesses at McConnell's hearing—two University police officers who responded to and investigated the

---

[2] The dissent observes that Female UH Student "was never investigated for her lascivious advances toward Plummer." Plummer never submitted a formal complaint to EOS, which would have required EOS to intitiate investigative processes.

[3] "Sexual activity" as defined by the University's 2013 Sexual Misconduct Policy includes "any intentional contact with the breasts, buttock, groin, or genitals, or touching another with any of these body parts, or making another touch the Complainant or themselves with or any of these body parts; and any intentional bodily contact in a sexual manner, though not involving contact with/of/by breasts, buttocks, groin, genitals, mouth or other orifice."

incident—and none at Plummer's hearing. An additional University EOS attorney was present at each hearing to advise the panel.

McConnell's and Plummer's attorneys attended and participated in the hearings. Although the University's procedures explicitly allow a student's attorney only a minor role as an "adviser" at the appeal hearing, in this case, the University allowed McConnell's and Plummer's attorneys to participate more fully, including at times by examining and cross-examining witnesses and making statements to the panel. Additionally, McConnell's and Plummer's attorneys drafted and submitted formal responses to the University's allegations and met with University officials on several occasions to discuss the evidence against the plaintiffs.

McConnell and Plummer each made opening and closing arguments, testified, presented witnesses, cross-examined witnesses, and raised legal and factual objections to the panel. The University's procedures explicitly allow cross-examination of witnesses only through the submission of written questions. Here, however, the panels frequently allowed all parties (or their attorneys) to question witnesses (including Baker) in person at the hearing. McConnell and Plummer were informed of the investigatory evidence several days before each hearing, although some identities were redacted from materials based on educational privacy concerns. At each hearing, the panel was shown the Dorm Room and Elevator Videos, and all parties offered interpretations of the videos' contents. Female UH Student was not deposed and did not appear or testify at either hearing. Neither Baker nor any other witness testified to the substance of any conversations with Female UH Student about her memory of the night, and Female UH Student's original complaint—which was among the materials supplied to the panels—stated

No. 15-20350

that she did not remember anything that occurred after she arrived at the bar the night of the incident.

Both hearing panels upheld Baker's findings. McConnell and Plummer then appealed to Richard Walker, the University's Vice President and Vice Chancellor for Student Affairs and Enrollment Services, as allowed by the University's procedures. In September 2014, Walker denied these further appeals. McConnell and Plummer were expelled and banned from the University and any activities connected with it.[4] The disciplinary notations were, however, removed from their official transcripts.

In this lawsuit challenging their discipline, McConnell and Plummer complain that the University retroactively applied its 2013 Misconduct Policy to their 2011 conduct. They also assert that the University's hearing procedures failed to give them adequate notice of the adverse evidence, denied them confrontation rights against Female UH Student, and limited cross-examination to written questions. Finally, they charge that Baker's multiple roles created impermissible conflicts. These deficiencies, they allege, deprived them of constitutional due process.[5]

The district court, in a 36-page opinion relying on Supreme Court and Fifth Circuit law, concluded that the process offered to McConnell and Plummer was constitutionally sufficient. *Plummer v. Univ. of Hous.*, No. 4:14-CV-2959, 2015 WL 12734039 (S.D. Tex. May 28, 2015). McConnell and Plummer appealed. We affirm.

---

[4] McConnell graduated from the University before his sanction was imposed.

[5] The dissent criticizes the University's use of a "preponderance of the evidence" standard for the panels' review of Baker's initial findings. McConnell and Plummer, however, do not challenge this aspect of their proceedings on appeal.

6

No. 15-20350

II

"It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975); *see also Davis ex rel LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."). "A university is not a court of law, and it is neither practical nor desirable it be one." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 n.1 (6th Cir. 2005) (citation omitted). Ultimately, courts must focus on "ensuring the presence of 'fundamentally fair procedures to determine whether the misconduct has occurred.'" *Id.* at 634 (quoting *Goss v. Lopez*, 419 U.S. 565, 574 (1975)).

Generally, the amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student's interests that will be affected; (b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university's interests, including the burden that additional procedures would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). In *Goss v. Lopez*, the Supreme Court held that an informal give-and-take between a high school student and the administration afforded sufficient process preceding a temporary suspension. 419 U.S. at 584. The Court specified, however, that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id*. This court has held that "due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961). "[T]he interpretation and

7

application of the Due Process Clause are intensely practical matters and . . . 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Goss*, 419 U.S. at 578 (alteration omitted) (quoting *Cafeteria Workers v. McElroy*, 357 U.S. 886, 895 (1961)). "The nature of the hearing should vary depending upon the circumstances of the particular case." *Dixon*, 294 F.2d at 158.

Here, the first and third *Mathews* factors are easily identified. On the one hand, McConnell and Plummer have a liberty interest in their higher education. *See Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929–30 (Tex. 1995) (recognizing a liberty interest in graduate higher education under the Texas Constitution); *accord Dixon*, 294 F.2d at 157 ("The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing.").[6] The sanctions imposed by the University could have a "substantial lasting impact on appellants' personal lives, educational and employment opportunities, and reputations in the community." *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016) (unpublished) (citing *Goss*, 419 U.S. at 574–75). On the other hand, the University has a strong interest in the "educational process," including maintaining a safe learning environment for all its students, while preserving its limited administrative resources. *See Goss* 419 U.S. at 580, 583; *see also Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 14–15 (1st Cir. 1998) ("Although the protection of [a student's private interest] would require all possible safeguards, it must be balanced against the need to

---

[6] Texas has not recognized a property interest in graduate higher education. *Than*, 901 S.W. 2d at 930 n.1.

promote and protect the primary function of institutions that exist to provide education.").[7]

Applying the second *Mathews* factor—the risk of erroneously depriving McConnell and Plummer's interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards—the unique facts of this case render it unnecessary that we draw any determinative line regarding sufficient procedures in state university disciplinary cases. McConnell and Plummer received multiple, meaningful opportunities to challenge the University's allegations, evidence, and findings. In light of the graphic conduct depicted in the videos and photo—which the panels viewed for themselves before affirming the University's findings—further procedural safeguards would not have lessened the risk of an erroneous deprivation of McConnell and Plummer's interests or otherwise altered the outcome. *See Mathews*, 424 U.S. at 335; *see also Flaim*, 418 F.3d at 639–43 (holding that additional procedures were not necessary in case without significant factual disputes); *Cummins*, 662 F. App'x at 446–451 (finding students accused of sexual assault received adequate due process in university disciplinary hearings where, "although the procedures employed by [the university] did not rise to the level of those provided to criminal defendants," students received an

---

[7] The dissent narrowly characterizes the University's interest as "impartially adjudicating quasi-criminal sexual misconduct allegations." Although it is true that the University is interested in providing a fair disciplinary process, the Supreme Court has emphasized that "[a] school is an academic institution, not a courtroom or administrative hearing room." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 88 (1978); *see also Goss*, 419 U.S. at 580, 583 ("[F]urther formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process."); *Gorman*, 837 F.2d at 15 ("[I]t is no exaggeration to state that the undue judicialization of an administrative hearing, particularly in an academic environment, may result in an improper allocation of resources, and prove counter-productive.").

"opportunity to be heard at a meaningful time and in an meaningful manner" (quoting *Mathews*, 424 U.S. at 333)); *cf. Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 230 (5th Cir. 1998) ("There may be cases of such gross and outrageous conduct in open court as to justify very summary proceedings for an attorney's suspension or removal from office, but even then he should be heard before he is condemned." (internal quotation omitted)); *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (recognizing that the existence of undisputed video evidence, which discredited the plaintiff's version of events, justified summary judgment).[8] Thus, we hold that McConnell and Plummer did not meet their summary judgment burden to demonstrate a genuine factual dispute that the process surrounding their disciplinary cases was constitutionally defective.

McConnell and Plummer argue several potential violations of due process standards. They assert inadequate notice of the standards of conduct because the University's sexual harassment/misconduct policy was changed between 2011, when the incident occurred, and 2013, when they were formally accused. They contend the investigation against them was not full and fair, that Baker's role was suffused with conflicts and bias against them, that there

---

[8] The dissent criticizes our reliance on *Flaim* and *Cummins*. *Flaim* supports our decision not because it involved identical circumstances (it did not), but because it demonstrates that the amount of process constitutionally required in state university disciplinary proceedings will vary in accordance with the particular facts of each case. *See* 418 F.3d at 629 & n.8 ("It is because of the unique facts of this case that we find the procedures used by Medical College of Ohio adequate."). *Cummins*, which we observe for its persuasive analysis, arguably is distinguishable by a feature that would suggest *more* process was due those students than McConnell and Plummer: the sexual assault victims in *Cummins* testified at the accused students' hearings and the students were allowed limited cross-examination only by submitting written questions to the panel. 662 F. App'x at 439–442 (one of the accused students was precluded from cross-examining his accuser entirely). In rejecting the students' challenge to this alleged procedural flaw, the *Cummins* court explained that "[a]ny marginal benefit that would accrue to the fact-finding process by allowing follow-up questions in appellants' . . . hearings is vastly outweighed by the burden on [the university]." *Id.* at 448.

was an "absence of direct evidence," and that they were denied confrontation of the victim and effective cross-examination. Each of these claims will be briefly discussed.

The claim that a standard of misconduct was retroactively imposed on McConnell and Plummer is unsupportable on the facts of this case. Their conduct, as detailed in the photo and two videos, violated the University's Interim Sexual Assault Policy (effective in November 2011), which prohibited sexual assault as "the touching of an unwilling person's intimate parts . . . through the use of the victim's mental or physical helplessness of which the accused was aware or should have been aware." The policy also prohibited ". . . sexual misconduct which is lewd, exhibitionistic or voyeuristic . . . [and] forbids . . . any act which demeans, degrades, or disgraces any person . . . ." The University's Interim Sexual Harassment policy (effective in November 2011) prohibited "the use of sexually oriented photos . . . unrelated to instruction and/or the pursuit of knowledge."[9] The conduct captured in the videos and photo also violated the more broadly worded 2013 Sexual Misconduct Policy, which encompassed the following violations: (facilitating) sexual assault; taking abusive sexual advantage of another; and non-consensual electronic recording and transmitting sexual images without the knowledge and consent of the parties involved. As applied to this conduct, the charged violations are neither vague nor outside the legitimate purview of the policies.

McConnell and Plummer also assert that they were denied confrontation of Female UH Student and the opportunity to effectively cross-examine

---

[9] Plummer's posting of the photo to Facebook and sharing the videos with her friends would constitute sexual harassment under the 2011 policy, as would her on-video remarks about Female UH Student.

adverse witnesses. This case does not require that we determine whether confrontation and cross-examination would ever be constitutionally required in student disciplinary proceedings. The unique facts of this case demonstrate no procedural deficiency in this regard. The University's case did not rely on testimonial evidence from Female UH Student. Indeed, it is undisputed that Female UH Student remembered little about the incident, and no one testified to the substance of any conversations with her about her memory of the night. Rather, the primary evidence Baker presented to the panels were the videos and photo, taken and distributed by Plummer. The conduct depicted in the videos and photo—combined with Plummer's subsequent distribution and publication—was sufficient to sustain the University's findings and sanctions. *See Mathews*, 424 U.S. at 335 (courts must weigh whether further procedural safeguards would have lessened the risk of an erroneous deprivation or otherwise altered the outcome). We emphasize that McConnell and Plummer do not argue that Female UH Student's testimony or cross-examination would have suggested that she consented to the degrading and humiliating depictions of her in the videos and photo, nor that such testimony could have otherwise altered the impact of the videos and photo.[10] *See Flaim*, 418 F.3d at 641 (citing *Winnick v. Manning*, 460 F.2d 545, 549 (2d. Cir. 1972)) (concluding that cross-examination of arresting officer was not essential to due process in medical student's disciplinary hearing when the case did not turn on credibility of testimony and plaintiff was unable to identify any significant benefits that cross-examination would have provided). Further, because McConnell and

---

[10] Plummer contends that Female UH Student sexually harassed her by repeatedly asking to "sex her." This disputed allegation, if true, would at best demonstrate independent misconduct, not a defense to Plummer's own actions.

Plummer do not challenge the authenticity of the videos and photo, it does not makes sense to criticize an "absence of direct evidence."

McConnell and Plummer's claims that the University failed to provide adequate notice of adverse evidence and that Baker's multiple roles suffused the proceedings with bias are similarly unpersuasive. Applying the second *Mathews* factor, even if the University could have provided notice further in advance of the hearings of the identities of relevant witnesses and other evidence, the ultimate disciplinary decisions were conclusively supported by the videos and photo, about which McConnell and Plummer had full knowledge. *See Mathews*, 424 U.S. at 335. McConnell and Plummer do not show how more timely knowledge of the adverse evidence could have aided in their defense. *See id.* Likewise, McConnell and Plummer have not demonstrated that Baker's dual roles amount to a constitutional violation. They argue that Baker's dual role as victim advocate and investigator prevented him from impartially investigating the incident, and that EOS's role in advising the panel created a conflict of interest.[11] But McConnell and Plummer fail to show how any of these alleged impermissible conflicts undermined the integrity of their proceedings. Baker relied primarily on the videos and photo to support his findings before the panel, and there is nothing in the record or offered by McConnell and Plummer to suggest that a different

---

[11] At the hearings, Baker offered interpretations of the graphic evidence, as well as legal argument about how the University's Sexual Misconduct Policy should be interpreted and applied to that evidence. McConnell and Plummer (on their own and through their attorneys) argued their own interpretations of the video and photo evidence and often vigorously contested the analysis offered by Baker. At both hearings, the separate EOS attorney serving as panel adviser counseled the panel members that they were free to interpret the video and photo evidence themselves and draw their own conclusions about the import of that evidence. This separate EOS attorney adviser also responded to panel questions regarding the meaning and application of the University's Sexual Misconduct Policy.

investigator would have uncovered information diminishing the significance of that graphic evidence to the initial findings. *See Mathews*, 424 U.S. at 335; *cf. Baran v. Port of Beaumont Nav. Dist. of Jefferson Cty.*, 57 F.3d 436, 446 (5th Cir. 1995) ("[Where a]llegations of bias based on the prejudgment of the facts or outcome of a dispute generally stem from the fact that an administrative body or hearing officer has dual roles of investigating and adjudicating disputes and complaints . . . the honesty and integrity of those serving as adjudicators is presumed." (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (5th Cir. 1975))). Notably, the separate EOS attorney advisor explicitly instructed the panels that they were free to disagree with the interpretations of the evidence offered by the parties, including Baker.

We have carefully reviewed the record, and we hold that the process Appellants received was sufficient. It follows that the question of qualified immunity for the individual defendants becomes moot. Again, we emphasize that we do not suggest a constitutional "floor" for state university disciplinary procedures. Whether a state university has provided an individual student sufficient process is a fact-intensive inquiry and the procedures required to satisfy due process will necessarily vary depending on the particular circumstances of each case. *See Dixon*, 294 F.2d at 158. As we noted at the outset, the Supreme Court has admonished that "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Wood*, 420 U.S. at 326; *see also Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

### III

We now turn to McConnell and Plummer's argument that the district court erred in dismissing their Title IX claims. The district court carefully

articulated the principles governing dismissals under Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim and for McConnell and Plummer's claims that the University and individual defendants should be liable for sex discrimination against them under Title IX. 20 U.S.C. § 1681(a). We find no error in the district court's dismissal.

We review the dismissal and the district court's related conclusions of law de novo. *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 294 (5th Cir. 2003). Briefly, McConnell and Plummer were required to plead facts asserting a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The University, as a recipient of federal funding, can be held liable for intentional discrimination on the basis of sex or for deliberate indifference to discrimination against or harassment of a student on the basis of sex. *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173 (2005).[12]

According to the Second Circuit, a university can face Title IX liability for imposing discipline where gender is a motivating factor for the decision under two general theories. *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). In the first instance, the claim is that the charged student (plaintiff) was innocent and wrongly found to have committed an offense. *Id.* The second instance alleges selective enforcement, i.e., that regardless of the student's culpability, the severity of the penalty and/or the university's decision to initiate proceedings was affected by the charged student's gender. *Id.* More recently, the same court held a student's case sufficient to proceed under Title IX where a male student alleged himself innocent of engaging in nonconsensual sex with a female student. *Doe v. Columbia Univ.*, 831 F.3d 46,

---

[12] Liability under Title IX does not extend to school officials, teachers and other individuals. *Davis,* 526 U.S. at 640–43. Hence, McConnell and Plummer do not appeal the dismissal of the University administrators.

50, 53, 59 (2d Cir. 2016). He further alleged procedural bias and improprieties in the university's discipline process. *Id.* at 56–59. He also alleged that he was singled out because Columbia University was in the midst of a public campaign criticizing its alleged weak response to female students' complaints of sexual assaults by males. *Id.* at 50–51, 53, 57–58. McConnell and Plummer and the University each rely on the theories adopted in *Yusuf*, so we need not speculate on any other possible theories of Title IX liability.

McConnell and Plummer's allegations here rest on selective enforcement and deliberate indifference to their rights. With regard to selective enforcement, they urge that the University was motivated by gender bias in favor of Female UH Student. They assert essentially that McConnell and Female UH Student were *in pari delicto*, in that both had passed out and each engaged in sexual conduct with another extremely intoxicated individual. Plummer chides the University for not taking up her charge of misconduct against Female UH Student for pressing to "sex" her. We agree, however, with the district court's assessment of the undisputed facts: the photo and graphic videos, taken and later exhibited by Plummer, show McConnell touching Female UH Student in private areas. Female UH Student is unresponsive and inactive. Female UH Student was found naked in an elevator and taken to the hospital for sexual assault testing. The University's discipline was predicated on what the two charged students did, and during the discipline process they—a male and a female—were treated equally. There is no sound basis for an inference of gender bias.[13]

_____

[13] McConnell and Plummer assert that the district court should not have awarded the University "summary judgment" based on the University's list of 39 sexual harassment investigations conducted from 2010 forward, which revealed that nearly all involved male accused students and only 3 involved male accusers. The district court did not address this

No. 15-20350

McConnell and Plummer tersely assert that the University was deliberately indifferent to the constitutional insufficiency of the procedures it employed in sexual misconduct discipline cases. Although the University may have been better advised in a number of procedural respects, there is a stark contrast between McConnell's and Plummer's culpability and case procedures applied to them and the allegations of student innocence and official refusal to conduct a thorough investigation in *Columbia Univ.*, 831 F.3d at 49–50, 52–53, 56–57. Deliberate indifference to constitutional rights is a very high standard of misconduct. *See Sanches v. Carrollton-Farmers Branch Ind. Sch. Dist.*, 647 F.3d 156, 169–70 (5th Cir. 2011). As the district court held, the pleadings here do not meet that standard.

IV

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

list, and we need not do so except to note that the same list shows that at least 41% of the investigations resulted in EOS making "no finding" against the accused.

EDITH H. JONES, Circuit Judge, dissenting:

With due respect to my colleagues' refusal to set a "constitutional floor" for the students' procedural due process claims, I dissent. This case is the canary in the coal mine, auguring worse to come if appellate courts do not step in to protect students' procedural due process right where allegations of quasi-criminal sexual misconduct arise. Yes, there is undisputed graphic evidence—videos and a photo of what transpired among McConnell, Plummer and the Female Student on November 19, 2014. The panel's conclusion seems driven by the "unique facts" of graphic evidence to discount all of McConnell's and Plummer's serious arguments. Put bluntly, the panel implies that because they were guilty, they got enough due process.

The panel's mode of analysis, in my view, is contrary to *Carey v. Piphus*, 435 U.S. 247, 265, 98 S. Ct. 1042, 1053 (1978). In *Carey,* high school students were suspended for a few weeks without any adjudicative hearing; the authorities did not challenge the lower courts' liability determinations. *Carey* makes clear that the result of a deprivation of liberty or property does not justify the procedural means: "Even if respondents' suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process." 435 U.S. at 265, 98 S. Ct. at 1053. Further, "[b]ecause the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury." 435 U.S. at 266, 98 S. Ct. at 1054 (citations omitted). *See also Zinermon v. Burch*, 494 U.S. 113, 126 n.11, 110 S. Ct. 975, 983, 108 L. Ed. 2d

No. 15-20350

100 (1990); *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012); *Caine v. Hardy*, 943 F.2d 1406 (5th Cir. 1991) (en banc).

I would hold that several features of the process to which McConnell and Plummer were subjected, most prominently the intermingled and inherently conflicting duties of UH Title IX Coordinator Baker, violated their due process rights to defend against quasi criminal charges of sexual assault and facilitating sexual assault. I would reverse and remand for further proceedings, which necessarily include the question of qualified immunity.

The background of this controversy, left unmentioned by the panel although both parties cited and relied on it, is the promulgation by the United States Department of Education, Office of Civil Rights, of a circular that offered "guidance" on how universities must respond to complaints of sexual misconduct on campus. *See* United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter, (2011), available at http://www2.ed.gov/print/about/offices/list/ocr/letters/colle ague-201104.html. The circular was not adopted according to notice-and-comment rulemaking procedures;[1] its extremely broad definition of "sexual harassment" has no counterpart in federal civil rights case law;[2] and the procedures prescribed for adjudication of sexual misconduct are heavily

---

[1] The Dear Colleague Letter is currently being challenged in the U.S. District Court for the District of Columbia on the grounds that it did not go through notice-and-comment rulemaking, is in excess of the Department of Education's statutory authority, and constituted arbitrary and capricious agency action. *See* Complaint at 18-22, *Doe v. Lhamon*, No. 1:16-cv-00158 (D.D.C. June 16, 2016), ECF. No. 1.

[2] *Cf. Davis v. Monroe Cty. Bd. Of Ed.,* 526 U.S. 629, 634, 119 S. Ct. 1661, 1667 (1999) (student-on-student sexual harassment actionable only where it is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit"); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (sexual harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive").

weighted in favor of finding guilt. Institutions of higher learning, like the University of Houston, flocked to embrace the "guidance." From a federal government database, it is estimated that between 20,000 and 25,000 complaints of sexual misconduct have been filed based on the "guidance" and thousands of students' discipline cases adjudicated using procedural standards far less demanding than those accorded most defendants. *See* K.C. Johnson & Stuart Taylor, Jr., *The Campus Rape Frenzy* 9-10 (Encounter Books 2017). A number of lawsuits challenging these procedures have survived preliminary motions to dismiss, *see* Johnson & Taylor *passim,* as state and federal courts exhibited concern about deficient procedures.

The University policies used in this case largely tracked the DOE guidance letter. For this reason, it is a hollow claim that the procedures are owed particular deference as products of "institutions of higher learning." These policies were developed by bureaucrats in the U.S. Department of Education and thrust upon educators with a transparent threat of withholding federal funding. Viewed as a whole, without the panel majority's self-imposed blinkers, the procedures raise serious questions about the sufficiency of the University of Houston's procedures to adjudicate fully and fairly charges of sexual misconduct that will affect the students' future lives as surely as criminal convictions.

In part because the female had no recollection of these events, and she denied anyone had touched or hit her, she declined to file a charge against the students. Because of insufficient evidence, no criminal charges were filed.

Instead, McConnell and Plummer were investigated and charged by Baker, the Vice President of the UH Office of Equal Opportunity Services (EOS), with various violations of the UH sexual misconduct policy (2013 version). Baker's official Title IX position placed him in the multiple, and

inherently conflicting, roles of *advocating* for the female student, *investigating* the events, *prosecuting* McConnell and Plummer, *testifying* as a witness at their hearings, and *training* and *advising* the disciplinary hearing panels. By a "more likely than not" standard, his investigative report found that McConnell "violated the sexual assault and attempted sexual assault provisions . . . when he engaged in sexual activity with another [sic] [female UH student] on November 19, 2011, without her consent." Under the same standard, Baker found that Plummer "facilitated/encouraged the sexual assault of another [UH] student."

During each student's separate hearings, Baker informed the panels that their only job was to determine "by a preponderance of the evidence," which he carefully distinguished from the beyond-a-reasonable doubt standard, whether the results of *his investigation* should be sustained. And lest it be overlooked, Baker ludicrously tried to persuade the panels that the video portrayed Plummer encouraging McConnell to rape the Female Student.[3] Baker, in essence, assumed the roles of prosecutor, jury and judge, whose decision the hearing panels were required to approve only by a preponderance of the evidence.

Other aspects of the procedures are troubling. Although the students' attorneys participated in the proceedings to some extent, they were not permitted formally to represent their clients. Instead, McConnell and

---

[3] The hearing transcripts demonstrate that Baker pressed his accusations beyond the photo and videos, in the guise of "interpreting" the evidence, to assert that Plummer was encouraging McConnell to attempt rape. When challenged about this during one hearing, Baker responded: "I cannot interpret evidence, that [then?] I cannot be a Title IX coordinator because that's exactly what I've been hired to do. *I've been hired to resolve these complaints by interpreting policy and by interpreting evidence . . . .*" A university discipline panel is no place to adjudicate credible accusations of rape—and there were no such accusations here.

Plummer each played lawyer against the real lawyer, University EOS Vice President Baker. Thus, the students made opening and closing arguments, testified, raised legal and factual objections to the panel, and "cross-examined" witnesses. They were not fully informed of the investigatory evidence until less than a week before each hearing;[4] even then, witness identities were redacted based on "privacy" concerns. Most important, there was no "confrontation" of the female student, who never appeared, was not deposed, and was never investigated for her lascivious advances toward Plummer.[5]

Based on the graphic video and photo evidence, it is unsurprising that the hearing panels upheld Baker's charges and the students' appeals were rejected. (The meaning of "sexual assault" in this context is open-ended but could have covered the conduct here.) They were expelled and permanently banned from UH and any activities connected with it. The disciplinary notations were removed from their official transcripts, but that matters little

---

[4] The University's procedures required only five business days' prior notice of evidence against the students.

[5] UH's brief defends its practices, noting that "the Department of Education has stated that it 'strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing on alleged sexual violence.'" The cited DOE guidance goes on to explain that this is because "[a]llowing an alleged perpetrator to question a complainant directly may be traumatic or intimidating, and may perpetuate a hostile environment." *See* United States Department of Education, Office for Civil Rights, Questions and Answers on Title IX and Sexual Violence, http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf*,* at p. 31. It then recommends that schools limit cross-examination by pre-submitting questions to a hearing board and that the hearing board screen the questions, which is what happened in this case. Given the nature of charges against these students, limiting cross-examination to written questions seems dubious. *See Doe v. Brandeis Univ.,* 177 F.Supp. 3d 561, 604-05 (D. Mass. 2016) ("While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns.").

for the impact of the "sexual predator" stigma on their careers and reputations.[6]

The panel correctly cites this court's decision in *Dixon* for the proposition that the students have at least liberty interests protected under the due process clause.[7] *Dixon v. Alabama State Bd. Of Ed.*, 294 F.3d 150, 151 (5th Cir. 1961).[8] The panel concludes as a matter of law that the process offered to McConnell and Ryan was constitutionally sufficient, relying in large part on the "unique facts" and case law that has little in common with quasi criminal charges of sexual assault that will mar these students indefinitely. Two Sixth Circuit cases, one published and one unpublished, will be shown to be particularly weak reeds. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 639–43

---

[6] *Accord Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929-30 (Tex. 1995) ("A medical student charged with academic dishonesty faces not only serious damage to his reputation but also the loss of his chosen profession as a physician. The stigma is likely to follow the student and preclude him from completing his education at other institutions.").

[7] *Univ. of Tex. Med. Sch. at Hous.*, 901 S.W.2d at 929-30 (recognizing liberty interest in graduate education under Texas Constitution). Property interests are creatures of state law, and Texas has not recognized a property interest in graduate higher education. *Id.* at 930 n.1. Other courts have applied *Dixon* to property interests created by state law. *See, e.g., Barnes v. Zaccari*, 669 F.3d 1295, 1303-04 (11th Cir. 2012).

[8] Other federal courts have relied on *Dixon* for the proposition that protected interests are implicated by university suspensions and expulsions. *See, e.g., Barnes*, 669 F.3d at 1305; *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633-36 (6th Cir. 2005); *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 663-64 (7th Cir. 2004); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 13-14 (1st Cir. 1988); *Nash v. Auburn Univ.*, 812 F.2d 655, 662-63 (11th Cir. 1987); *Harris v. Blake*, 798 F.2d 419, 422-23 (10th Cir. 1986); *Henson v. Honor Comm. of U. Va.*, 719 F.2d 69, 73-74 (4th Cir. 1983); *Sill v. Pa. State Univ.*, 462 F.2d 463, 469-70 (3d Cir. 1972); *Winnick v. Manning*, 460 F.2d 545, 548-49 (2d Cir. 1972); *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969); *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp.3d at 615.

This court seems to have overlooked *Dixon* when deciding recent cases that, unlike this one, involved discipline for academic reasons. *See, e.g., Perez v. Texas A&M Univ. at Corpus Christi*, 580 Fed. App'x 244, 248 (5th Cir. 2014) (per curiam); *Smith v. Davis*, 507 F Appx 359, 362 (5th Cir. 2013) (per curiam).

No. 15-20350

(6th Cir. 2005); *Doe v. Cummins*, 662 F. App'x 437, 446–451 (unpublished) (6th Cir. 2016).

In my contrary view, the process deployed against the students was fundamentally flawed because of (a) the absence of a complaint by and evidence from the Female Student; (b) the conflicting roles played by Baker; (c) the preponderance standard for adjudicating quasi criminal conduct (for which no actual criminal charges were brought), compounded by (d) the deference that Baker insisted was due by the hearing panels to his position.[9] While it seems incontestable that punishment of some kind was due for the students' graphically depicted conduct, these watered-down elements of process conspired to assure that Baker's recommendations to throw the book at McConnell and Plummer would be approved in full.

Put in terms of the *Matthews* balancing test, *Matthews v. Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976), the students' interests in preserving their educational status and reputations in the face of serious sexual misconduct charges were compelling.[10] Second, the risk of erroneous

---

[9] I do not agree that the students lacked fair notice that their conduct was unauthorized.

[10] *See Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp.3d at 622 ("[P]laintiff's lost opportunity to continue with his post-secondary education, coupled with the possibility that he may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects plaintiff's professional prospects. . . . And common sense suffices to understand that an adjudication of responsibility for sexual misconduct carries a . . . powerful stigma," such that robust due process is required.); *Brandeis Univ.*, 177 F. Supp.3d at 602 ("Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings."); *id.* at 573 ("If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision."); *see also Smyth v. Lubbers*, 398 F. Supp. 777, 797 (W.D. Mich. 1975) ("This case is among the most serious ever likely to arise in a college context. In the interest of order and discipline, the College is claiming the power to shatter

No. 15-20350

deprivation was exacerbated by (i) the Female Student's failure to participate or provide evidence in the disciplinary proceeding; (ii) Baker's role as her "advocate" while he also served as prosecutor, a witness, and legal adviser to the hearing panel; (iii) the preponderance test used by Baker in his report, along with the deference he claimed from the hearing panel;[11] and (iv) the imbalance between the level of counsel participation allowed on each side.

Third, additional or substitute safeguards would have enhanced the quality of factfinding and adjudication by providing a confrontation right if material fact issues existed. Eliminating Baker's role in advising and directing the hearing panel would have enabled the panel to make independent findings and receive disinterested advice on issues such as the meaning of "sexual assault" and "facilitating sexual assault."[12] Elevating the standard of proof to clear and convincing, a rung below the criminal burden, would maximize the accuracy of factfinding. Permitting counsel to represent the students would have resulted in more efficient hearings; the parties and hearing panels spent a lot of time sparring over trivial misunderstandings about procedure. Adopting some or all of the foregoing safeguards would not significantly impede the disciplinary process.

---

career goals, and to make advancement in our highly competitive society much more difficult for an individual than it already is.").

[11] Commentators have noted that applying the civil preponderance standard to quasi criminal charges seriously weakens due process for accused students. *See, e.g.,* Ryan D. Ellis, *Mandating Injustice: The Preponderance of the Evidence Mandate Creates a New Threat to Due Process on Campus*, 32 Rev. Litig. 65 (2013); Barclay Sutton Hendrix, *A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault in Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, 610-15 (2013); Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49, 62, 62 n.59 (2013).

[12] The panel majority note that Baker's assistant attorney served as adviser to the disciplinary panel. They have no rejoinder, however, to the "graphic facts" I quoted that demonstrate Baker's intent to dominate the proceedings in every way.

Fourth, the University's interest lies in impartially adjudicating quasi criminal sexual misconduct allegations.  The University has no significant expertise in this area; indeed, as noted above, its policies and procedures derive directly from the Dear Colleague letter, not from inherently educational decisions.  Further, to the extent that UH eliminates confrontation and counsel participation; allows one officer, Baker, to direct the investigatory, prosecutorial and adjudicative process; and relies on the lowest standard of proof, the integrity of its decisions may be questioned and discredited.[13]

Even assuming that McConnell and Plummer forfeited a challenge to their inability to confront the Female Student, the problem of Baker's conflict of interest cannot be overstated.  Baker could not conscientiously "advocate" for the Female Student while also conducting an impartial investigation of the accused students.  He could not both prepare a report and testify as a principal witness while serving as the prosecutor and then insist that the adjudicatory hearing panel agree with his "preponderance" evaluations of the evidence by their preponderance standard. But he purported to do all these things.  Even the Dear Colleague letter admonishes universities that:  "The Title IX coordinator should not have other job responsibilities that may create a conflict of interest.  For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest." Dear Colleague Letter at 7.  To the extent Baker's multiple roles substantially lessened the hearing panels' factfinding and adjudicatory autonomy, the integrity of the process was compromised. *See also Brandeis Univ.,* 177 F.Supp. 3d at 606 ("The dangers of combining in a single individual the power to

---

[13] The majority criticize this description of the University's interests as too narrow. Had the University adopted a real, serious concern for its "educational mission," it would not have opened a bar on campus near the dorms that served shots to students. Alcohol abuse is at the root of much student misconduct.

investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.").

As a final note, the Sixth Circuit case law cited by the panel is inapposite. In *Flaim,* the court upheld a medical student's expulsion *after* he had pled guilty to a felony criminal drug offense. While rejecting Flaim's individual procedural complaints, the court stated *five times* that the fact of a preexisting criminal conviction rendered his case "quite different from the ordinary" student discipline matter, 418 F.3d at 642-43, and "because of the unique facts," the court declined "to address whether these procedures would suffice under other facts." *Id. at* n. 8. *Flaim*, by its own terms, should not be relied on in a case where sexual assault is alleged only by the University's EOS Vice President and no criminal charges, much less convictions, were pursued. The *Flaim* court stated, "We strongly emphasize that a disciplinary hearing involving a record of conviction is wholly different from a case involving disputes of fact, even if the university believes the evidence to be overwhelming." *Id. at* n. 7.

The panel's reliance on the Sixth Circuit's unpublished opinion in *Doe* is also curious. First, that the opinion is "unpublished" means it is not to be cited as precedent. 6th Cir. R. 32.1; *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011) (en banc) ("Unpublished decisions in the Sixth Circuit are, of course, not binding precedent."). Second, the panel cites *Doe* for the uncontroversial proposition that students there, subjected to a different set of procedures, received an "opportunity to be heard in a meaningful time and in a meaningful manner," albeit not the level of protection that would have been offered to criminal defendants. 662 F.App'x. at 446 (quoting *Mathews*, 424 U.S. at 333).

Third, the *Doe* court found no due process violation in the denial of active participation by the students' advisors because the university had not itself been represented by counsel in their disciplinary hearings. 662 F.App'x. at 448-49 (citing *Flaim,* 418 F.3d at 640). In this case, however, the students were out-gunned by attorney Baker. Fourth, the *Doe* court rejected the claim of official bias because any defects in the investigator's report were "cured" by the Administrative Review Committee's "subsequent handling of appellants' cases." 662 F.App'x. at 450. Contrary to several critical facts before us, *Doe* contains no indication that the allegedly biased investigator played any role in the committee's activity; the committee was bound by no formal standard of review; and no claim of deference to the investigator's report was made. Finally, the students in the case received, respectively, a 3-year suspension and a disciplinary suspension plus a research paper requirement, far more lenient treatment than that accorded McConnell and Plummer, even though the *Doe* defendants were found to have engaged in nonconsensual sex with female students.

In sum, I do not take the position that the students must be afforded the same procedural protections as criminal defendants. What drives my concern is the close association between the charges levelled against them and actual criminal charges. Sexual assault is not plagiarism, cheating, or vandalism of university property. Its ramifications are more longlasting and stigmatizing in today's society. The University wants to have it both ways, degrading the integrity of its factfinding procedures, while congratulating itself for vigorously attacking campus sexual misconduct. Overprosecution is nothing to boast about.

Even though these students deserved punishment, they also deserved more protective procedures given the seriousness of the charges. *See Carey, supra.* Accordingly, I would reverse and remand for further proceedings.