## NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0198n.06

Case No. 19-3520

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Apr 06, 2020

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| CASE WESTERN RESERVE UNIVERSITY; | ) | OHIO |
| BARBARA R. SNYDER; LOU STARK; G. | ) | |
| DEAN PATTERSON, JR.; GEORGE | ) | |
| O'CONNELL; SHANNON J. GREYBAR | ) | |
| MILLIKEN, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: SILER, GIBBONS, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** While a student at Case Western Reserve University, John Doe was accused of violating the University's sexual misconduct policy. Early in the ensuing investigation, John admitted to engaging in at least one form of non-consensual sexual intercourse with a fellow student. With the goal of resolving the matter without involving other students, John selected a streamlined hearing process, one that did not afford him the opportunity to question witnesses.

That forthrightness and candor nonetheless undermines John's challenge to the resolution of his disciplinary proceeding. While John now believes a more robust proceeding was necessary, we see no reason not to hold him to his earlier choices. Nor do we see blatant errors in the

University's handling of the investigatory and adjudicatory process. Accordingly, we **AFFIRM** the district court's decision rejecting John's claims.

## I.    BACKGROUND

During their sophomore and freshman years, respectively, Case Western Reserve University students John Doe and Jane Roe began a casual sexual relationship. The relationship included kissing and, on at least one occasion, digital penetration and oral sex. But it did not include sexual intercourse—Jane told John she did not want that type of relationship with anyone to whom she was not in a committed relationship. And when John later expressed stronger feelings towards Jane, Jane thought it better for the two to separate, rather than advance their relationship.

*Night of the Incident.* A few days after their separation, John and Jane separately went out drinking with their respective friends. Around one in the morning, John received a text from a friend stating that Jane appeared intoxicated, with the suggestion that John check on her. John went to find Jane. When he found her, John convinced her to return with him to his fraternity house.

What unfolded next is disputed. According to Jane, as she started to fall asleep, John began to kiss her. John proceeded to undress her, digitally penetrate her, and perform oral sex on her. John then inserted his penis into Jane's vagina. She stopped him. Suggesting that Jane instead perform oral sex on him, John, in Jane's words, "put it in [her] face." Jane began performing oral sex before stating that she did not want to do that either. She began to cry, at which point John drove Jane back to her dorm.

For John's part, he admits that he digitally penetrated Jane and performed oral sex on her. But he denies that he inserted his penis into her vagina, or that she performed oral sex on him.

2

*Initial Inquiry.* Roughly two months after the incident, Jane emailed Dr. Shannon Milliken, Case Western's Deputy Title IX Misconduct Investigator. An initial inquiry into the incident ensued. Milliken interviewed Jane. Milliken's assistant then emailed John to set up a time for Milliken to interview him. When John sought out Jane to discuss the situation, Jane let Milliken know that John had contacted her. The next day, Milliken emailed John with a no-contact order.

Not long thereafter, Milliken interviewed John. John made several incriminating comments. Chief among them was his admission that "[w]hat happened in the basement, I know I didn't physical [sic] force her or abuse her, but it was without her consent. She was not, by definition, capable of giving consent. What happened was my fault."

*Sexual Misconduct Investigation.* Milliken determined that the incident implicated the University's sexual misconduct policy. As a result, Milliken, as directed by the policy, undertook a more formal, broad-based investigation. As a part of this investigation, Milliken and the University's outside counsel interviewed 15 students. Milliken also met again separately with Jane and John. Following the investigation, Milliken created a report wherein she summarized the incident and the findings of her investigation.

Following Milliken's investigation, the University had to decide the appropriate adjudicatory process for resolving the matter. Within the "formal" adjudicatory process, the University policy provided two options: an administrative hearing and a board hearing. An administrative hearing is the more informal process of the two. Indeed, there is no "hearing" in the traditional sense. Instead, a single adjudicator meets individually with the parties, as she deems necessary. Based on these meetings and a review of the underlying investigatory materials, the adjudicator determines culpability and punishment. The parties do not present evidence or conduct cross-examination. A board hearing, by comparison, takes place before a three-member panel.

During the hearing, witnesses may testify, and a modified form of cross-examination is permitted. The accuser and the accused are invited to ask questions of the witnesses, and they can also submit to the panel questions they wish to ask each other. The panel then determines culpability and, when appropriate, administers punishment.

In signed statements, John and Jane each indicated they preferred an administrative hearing as opposed to a board hearing. In accordance with those expressed preferences, the University referred the matter to an administrative hearing.

*John's Administrative Hearing.* George O'Connell, the Director of the University Office of Student Conduct & Community Standards at Case Western, conducted the administrative hearing. O'Connell met with both John and Jane and reviewed materials provided to him from the investigation. "Based on [his] review of all provided information," O'Connell concluded that John was "responsible for non-consensual sexual intercourse under the university sexual misconduct policy." As a result, O'Connell ordered John to be suspended for two years, deemed *persona non grata* (meaning he was not permitted on campus during the suspension), and barred from residing in University housing upon his return.

Challenging the severity of his punishment on appeal, John requested either a three-month or one-year suspension. Alternatively, he sought a three-year suspension—to allow Jane to graduate before he returned to campus and so he could "have a clearer vision on how to proceed with [his] life." The appeals board rejected the first two requests, but granted the third, increasing John's suspension and *persona non grata* status to three years.

Almost two years later, John sued in district court, alleging that Case Western violated Title IX and breached its contract with him. Following dismissal of those claims at summary judgment, John brought this appeal.

4

## II.     ANALYSIS

### A. Title IX

Title IX prohibits universities that receive federal funds from discriminating against students because of their sex.  20 U.S.C. § 1681(a); *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018).  As evidence of a Title IX violation, John claims that Case Western's disciplinary process resulted in an "erroneous outcome."  *See Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018).  To prevail under Title IX, the plaintiff must "show that the 'outcome of [Case Western's] disciplinary proceeding was erroneous because of sex bias.'"  *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 639 (6th Cir. 2003)).  Doing so requires two showings:  first, that the outcome of the proceeding was tainted by some "articulable doubt," and second, that gender bias caused the articulable doubt.  *Baum*, 903 F.3d at 585 (quoting *Miami Univ.*, 882 F.3d at 592).

*John's Admission of Misconduct.*  We can resolve John's claim on the basis of the first prong, as he fails to show articulable doubt as to the outcome of his proceeding.  Case Western's sexual misconduct policy defines non-consensual sexual intercourse as "intercourse that involves all of the following: a) any sexual intercourse (anal, oral or vaginal); b) with any object or body part; c) by a person upon a person; and d) without consent."  As part of the University's investigation, John acknowledged that he digitally penetrated Jane without her consent.  As John described the pair's interaction: "[w]hat happened in the basement, I know I didn't physical [sic] force her or abuse her, but it was without her consent.  She was not, by definition, capable of giving consent.  What happened was my fault."  When Milliken provided John the opportunity to walk-back or clarify this statement during a subsequent interview, he did not do so.  By John's own word, then, he engaged in a) vaginal intercourse; b) with his finger; c) by himself upon Jane; and

d) without Jane's consent. This conduct, under the policy, constitutes non-consensual sexual intercourse.

True, there is some dispute over the extent of the non-consensual sexual activity that occurred. But that dispute, at most, goes to the *degree* to which John violated the policy, not *whether* he violated the policy in the first instance. Any discrepancies in John's and Jane's stories thus do not alter the investigation's ultimate conclusion that John violated University policy. Absent some unique circumstance, John's concession is enough to dispel the notion that his hearing resulted in an "erroneous outcome." *Cf. United States v. Oufnac*, 449 F. App'x 472, 476 (6th Cir. 2011) (finding that, in the criminal context, "admission of guilt is sufficient evidence to sustain the conviction[]" (citing *United States v. Mellies*, 329 F. App'x 592, 607 (6th Cir. 2009))).

While Case Western thus arrived at the correct outcome, we note that its decision finding John guilty of a violation and punishing him with a two-year suspension lacked some precision. While there is no doubt John violated the policy by digitally penetrating Jane without her consent, she made other allegations against him as well, allegations that were also mentioned in the decision. Yet the hearing officer failed to make express findings as to what exact conduct occurred between the two. O'Connell's decision states only that Jane did not consent to any kind of sexual intercourse. The degree of the violation (i.e., the exact type(s) of non-consensual sexual activity that occurred) is potentially relevant to the punishment John received. While John did not argue in his briefing that his punishment was harsher due to the degree of the violation, and while there is no evidence suggesting that O'Connell's finding hinged on the precise sexual activity that occurred, it may behoove the University, going forward, to articulate the precise basis for finding a violation and the precise basis for the punishment administered.

*John Waived Any Right He May Have Had To Cross-Examination*. As grounds for challenging the reliability of his disciplinary proceeding's outcome, John cites his inability to cross-examine witnesses. According to John, the disciplinary proceeding turned on whether the University believed John's or Jane's version of events—making each one's credibility a central issue. And, John adds, cross-examination would have resolved this credibility dispute, and thus enhanced the accuracy of the proceedings.

John is correct that, as a general matter, procedural flaws can undermine the veracity of a disciplinary proceeding's outcome. *See Baum*, 903 F.3d at 585–86 (citing *Yusaf v. Vassar Coll*., 35 F.3d 709, 715 (2d Cir. 1994)). And he is likewise correct to note that, at least in the context of due process considerations applicable to Title IX proceedings conducted by public institutions, cross-examination is required when "the university's determination turns on the credibility of the accuser, the accused, or witnesses." *Id.* at 581. We have yet to decide expressly how those considerations apply in the context of Title IX proceedings conducted by a private university, where constitutional due process principles lack the same force. *See id.* at 585–86 (noting that a plaintiff's *allegation* of a procedural flaw is enough to plead articulable doubt, but making no statement as to whether all Title IX claims require cross-examination as a matter of right). And we need not do so today. For even if John was entitled to some manner of cross-examination, he waived that right.

Individuals subject to administrative proceedings are free to waive rights they may otherwise be entitled to in that forum. *See, e.g.*, *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 510 (2d Cir. 2009) (finding that a plaintiff waived her statutory right to counsel in a social security hearing); *Covucci v. Apfel*, 31 F. App'x 909, 912 (6th Cir. 2002) (mem.) (finding that plaintiff waived his right to counsel at an administrative hearing); *Butler v. Comm'r of Soc. Sec.*, No. 96-

7

1211, 1997 WL 259374, at *4 (6th Cir. May 15, 1997) (per curiam) (table decision) (finding that the due process right to cross-examination in an administrative hearing is waived when an attorney is silent during the opportunity for cross-examination); *Worthams v. Bd. of Educ. of Memphis City Sch.*, No. 90-5936, 1991 WL 119266, at *2 (6th Cir. July 1, 1991) (per curiam) (table decision) (finding that a dismissed teacher waived his right to a board hearing when he opted to have an arbitrator review his dismissal) (citing *Malone v. U.S. Postal Serv.*, 526 F.2d 1099, 1105 (6th Cir. 1975)). To be sure, disciplinary cases in which waiver principles are enforced often arise in the due process context. *See Leary v. Daeschner*, 228 F.3d 729, 744 (6th Cir. 2000) (finding that plaintiffs waived their due process right to a pre-deprivation hearing when they failed to attend the hearing). But those principles would seem to apply with equal force in the Title IX context. At least one court has expressly said as much. In *Pacheco v. St. Mary's University*, the district court, like here, addressed claims that a Title IX proceeding produced an erroneous outcome. No. 15-cv-1131 (RCL), 2017 WL 2670758, at *15 (W.D. Tex. June 20, 2017). And like here, the plaintiff complained that he did not get to cross-examine and confront his accusers. *Id*. at *17. But that alleged shortcoming was of the plaintiff's own making: he failed to "participate meaningfully in the investigatory hearing—he did not attend, and chose not to examine *any* witnesses at all." *Id*. With the plaintiff having failed to avail himself of those opportunities, among other reasons, there was no process-related flaw casting doubt over the outcome. *Id.*

So too here. John affirmatively waived any right to cross-examination when he stated: "I don't want any witnesses. I would like the sole administrator hearing." In fact, John's waiver was twice-over. In addition to expressly disclaiming an interest in calling witnesses, he also selected a form of hearing that did not allow for the presentation of evidence or cross-examination of witnesses (unlike a board hearing, which afforded him more robust rights). Not only that, but in

his briefing, he now likewise acknowledges that "the *Pacheco* court correctly found that there was no procedural flaw casting doubt on the accuracy of the proceeding." We see no difference between a plaintiff who chooses not to attend his witness-based hearing and a plaintiff who essentially forgoes that type of hearing altogether. Put differently, it is difficult to accept John's claim of procedural deficiency when he received exactly the procedure he requested.

## B. Breach of Contract

In addition to his Title IX claim, John also alleges that Case Western breached contractual duties owed to him. John bases his claim on the rules and procedures articulated in the University's sexual misconduct policy applicable to all admitted students. As a matter of Ohio law, "[w]hen a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature." *Savoy v. Univ. of Akron*, 15 N.E.3d 430, 436 (Ohio Ct. App. 2014). This contractual relationship is governed by the "college or university catalog, handbook, and/or other guidelines supplied to the students." *Id.* But universities need not strictly adhere to those policies. *See Tate v. Owens State Cmty. Coll.*, No. 10AP-1201, 2011 WL 2685664, at *3 (Ohio Ct. App. July 12, 2011) ("[T]he court is to defer to the decisions of the school unless it can find 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" (quoting *Bleicher v. Univ. of Cincinnati Coll. of Med.*, 604 N.E.2d 783, 788 (Ohio Ct. App. 1992))). When a university's adherence to a particular disciplinary policy is questioned, we generally ask only whether the university abused its discretion during the disciplinary process. *Faparusi v. Case W. Res. Univ.*, 711 F. App'x 269, 277 (6th Cir. 2017). Asked another way, did the university apply the rules in a reasonable manner? *Id.* None of the policy violations alleged by John clear that high hurdle.

9

*(1) Presence of a Support Person.*  John first finds error in the fact that a "support person" was not provided to him during Milliken's initial inquiry.  True, students have a right under the University's policy to a "support person" present with them at all stages of the process—including the initial inquiry.  But as we read the policy, it does not *require* a support person attend the initial inquiry; it simply allows the student to have one.  While John could have chosen to bring a support person, he did not.  And when meeting with John, Milliken asked him if there were any accommodations John would like to request; he requested none.

*(2) Notification of Jane's Complaint and the Ability to Remain Silent.*  John next claims that Case Western failed timely to inform him both of the complaint against him as well as of his policy-based right to remain silent while a subject of investigation.  As to the former, however, before his initial interview with Milliken, and after a conversation with Jane about the complaint she filed, John received a no-contact order from Milliken, which stated: "[t]he University Office of Student Conduct and Community Standards (UOSC&CS) is currently in the process of investigating allegations made regarding the sexual-misconduct policy.  This letter is to serve as official notice that you are to have no contact with Jane Roe for the duration of this investigation." Nor, in any event, does the policy explicitly state that John must be notified of the *specific* charges; it only requires that, as was the case for John, he be notified of a complaint.

As to the latter, when John met with Milliken for his initial interview, John did make statements that amounted to a concession of a violation of the University's sexual misconduct policy.  But John could have chosen to refrain from making any statements at that time.  Nothing in the University's policy required the University to assert this right on John's behalf, or otherwise notify him that he did not need to answer questions posed.

*(3) Wrong Procedure.* Nor do we accept John's assertion that he was contractually guaranteed the board hearing, with witness testimony and cross-examination. According to University policy, an administrative hearing "may" be used in certain situations, while "a board hearing *is used* when . . . [t]he respondent does not admit that the alleged sexual misconduct has occurred and/or does not admit that the alleged conduct is or could be construed as sexual misconduct under this policy." (Emphasis added). Contrary to John's contention, the policy does take into account the accused's preference of forum—it considers "[t]he wishes of the complainant and the respondent"—and John requested an administrative (not a board) hearing. What is more, while some facts were in dispute, it was undisputed that John *admitted* to the conduct of which he was accused: non-consensual sexual intercourse. For these reasons, the University was well within its rights to utilize the administrative hearing.

*(4) Non-Neutral Administrator.* Equally unavailing is John's claim that Milliken failed to act in a neutral manner. Milliken's questions, even if leading, are not indicators of bias; they are tools to employ at the investigator's discretion to uncover the truth. *See Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) (citing *United States v. DeCologero*, 530 F.3d 36, 56 (1st Cir. 2008)) (finding that the chairperson overseeing the questioning of witnesses did not exhibit gender bias when the plaintiff alleged that they received cross-examination like questions); *see also Liteky v. United States*, 510 U.S. 540, 555 (1994) (finding that, in the criminal context, "remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their case, ordinarily do not support a bias or partiality challenge"). And in any event, John was under no obligation to answer them in an incriminating manner.

*(5) Delivery of Policy.* Finally, John argues that he was not provided a copy of the sexual-misconduct policy in a timely fashion. Once a sexual misconduct investigation begins, the policy

11

itself provides that the university will "consider interim" actions "as appropriate," including "[p]rovid[ing] a copy of the university sexual misconduct policy to both parties," which should be done "as promptly as possible." That permissive standard to "consider" providing the misconduct policy is far from an iron-clad, mandatory requirement. This optional step would typically be taken, as stated in the policy, to "protect the safety and well-being of the individuals involved in a complaint of sexual misconduct." Yet whether John was provided a copy of the policy seemingly had little impact on his "safety or well-being." We thus do not see how the University's actions lacked professional judgment or constituted a clear abuse of discretion, especially when one considers that the policy was available online, and that Milliken provided John a printed copy of the policy prior to his administrative hearing. *See Tate*, 2011 WL 2685664, at *3; *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384–85 (6th Cir. 2011).

## CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.